UNITED STATES of America, Plaintiff,

v.

Mico Rachelle ROGERS, Defendant.

Crim. No. 6–80162.

United States District Court,
E. D. Michigan, S. D.

July 16, 1976.

Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Irving Tukel, Southfield, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This matter is before the court on defendant's Motion to Suppress Evidence filed pursuant to Rule 41(f) of the Federal Rules of Criminal Procedure. The defendant, Mico Rachelle Rogers, has been charged with possession of a controlled substance with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). An evidentiary hearing established the relevant facts.

On the morning of February 2, 1976, federal agents Jesse M. Back and Robert Macek were on duty at Detroit Metropolitan Airport, observing American Airlines flight 218 arriving from Los Angeles. Agent Back testified that agents routinely watch that flight because it has yielded an unusual number of arrests, but that on the morning in question they had no specific information concerning any person on the flight. As they watched the passengers deplaning, Back and Macek noted that defendant Rogers stood out from the crowd. Both agents testified that Rogers was "glancing about nervously" and "looking around in a nervous manner." They maintained surveillance as he went directly to the escalator, down the lower level corridor leading to the baggage claim area, and out the terminal doors to the cab stand. The agents testified that Rogers was walking rapidly, carrying a leather brief case and garment bag, and did not stop to pick up any additional luggage.

Agent Macek then approached Rogers, identified himself as a government narcotics agent, and asked him for identification. Rogers searched his pockets and failed to find identification, but he told the agents his name was Mico[1] Rogers. His airplane ticket, which he produced at their request, was made out to Michael Rogers. Rogers then explained that he had changed his name from Michael to Mico; he opened his brief case and withdrew an address book with the name "Mico" on the inside cover. The agents were also able to glance inside the brief case at that time and observed nothing unusual.

Suspicious about the absence of identification, Agent Back requested that Rogers step inside with them out of the public view.[2] Rogers then accompanied the two agents to an enclosed hallway set apart from the public area of the terminal by a door with a sign designating "authorized personnel only." Agent Back testified that he intended at that time to further question Rogers about his lack of identification, to ascertain whether Rogers was among those persons on a Drug Enforcement Administration list.[3] Back admitted, however, that neither Mico nor Michael Rogers was a name familiar to him from the list or as a suspected drug courier.

Once inside the enclosed hallway, the agents again asked Rogers to check for some identification. Rogers opened his brief case and sifted through a number of papers, some of which may have been bills with his name on them, but he could find no standard item of identification. Back then explained to Rogers that he and Macek were narcotics officers and wanted to search his bag for controlled substances. They told him he had a right to refuse the search.[4]

Rogers handed the brief case to Back, who made a cursory search and found nothing. Back then stated that he wanted to search the garment bag. Rogers laid the bag partly on the floor, opened it at least half way,[5] and put his hand inside the top part of the bag to indicate there was noth-

1. At the evidentiary hearing, there was some dispute whether defendant identified himself as "Meko" or "Miko." Defense counsel sought to persuade the court that defendant used the latter pronunciation, which might easily have been misunderstood to be "Michael." Back and Macek, however, maintained that Rogers identified himself as "Meko," which led them to believe he was traveling under an assumed name.

2. Defendant testified that the agents asked him to step inside because it was cold outside and they wanted him to be out of the public view. Defendant then inquired whether that was necessary and whether he would be arrested if he refused; the agents responded affirmatively to both questions. Back and Macek deny this interchange.

3. Neither agent testified as to the composition of the list or why certain names were listed.

4. While all parties agree that defendant was at some time informed that he had a right to refuse the search, defendant contends that he was not so informed until after Agent Back had placed his hand inside the garment bag.

5. Back and Macek testified that Rogers opened the bag to within an inch or two of the bottom; Rogers insisted that he pulled the zipper no more than half-way down and that Back opened it the rest of the way.

ing out of the ordinary inside. Agent Back, stating that he wanted to search the bag himself, put in his hand and withdrew a brown paper bag which contained a white powdery substance later identified as heroin. At that very moment, Rogers started to flee but stopped when Macek called after him. The agents then placed him under arrest. Defendant contends that the initial stop by Agents Back and Macek was without legal justification and that all evidence flowing from that stop should be suppressed.

The factual background of this case involves the recent effort by the government to more effectively block the flow of narcotics and other controlled substances into the Detroit metropolitan area. Agents Back and Macek indicated that the drug enforcement operation involves routine surveillance of direct flights from "shipping cities," that is, cities known to be centers of narcotics distribution such as Los Angeles, Miami, and New York. Deplaning passengers are observed for characteristics matching a drug courier "profile." Little testimony was presented concerning the source and content of the profile other than Agent Back's assertions that it is a composite given to him by his superiors and that the profile characteristics include direct flights from shipping cities, little or no luggage, and nervous mannerisms.

The approach taken by the government in this area is an extension of two other approaches which have been found to be reasonably effective in combating illegal activity. The first is the anti-skyjacking program of the early 1970's. That program involved the use of a highly controversial hijacker profile which was found in a number of cases to be an acceptable screening device when used in conjunction with other detectors such as the magnetometer. *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973); *United States v. Legato,* 480 F.2d 408 (5th Cir. 1973); *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973); *United States v. Bell,* 464 F.2d 667 (2nd Cir. 1972); *United States v. Lopez,* 328 F.Supp. 1077 (E.D.N.Y.1971). The other approach is the border patrol identification stop, authorized by the Immigration and Nationality Act, 8 U.S.C. § 1357(a), the guidelines for which were recently articulated in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1974); and *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

The law delimiting Fourth Amendment activity in the skyjacking and border search cases evolved from the reasonableness requirement of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), and its progeny. It is appropriate, therefore, for this court to review the law which describes and limits a legally justified stop as it has developed from *Terry* and the skyjacking and border search cases.

*Terry* established that a stop which is not an arrest, although clearly a Fourth Amendment "seizure," may be justified on less than full probable cause if it does not violate the general proscription against unreasonable searches and seizures. 392 U.S. at 20, 88 S.Ct. 1868. The court went on to define "reasonableness" in the context of an on-the-scene stop:

(I)n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate

hunches, a result this Court has consistently refused to sanction. 392 U.S. at 22–23, 88 S.Ct. at 1880.

In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1971), the court expanded somewhat on the parameters of police activity justified by *Terry.* In upholding a stop and frisk based upon an informant's tip, the court stated:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. 407 U.S. at 145–46, 92 S.Ct. at 1923.

Both *Terry* and *Adams* involved instances in which the police had reason to suspect that the person stopped was armed and contemplating criminal activity. The "reasonableness" approach, however, has been extended to instances in which the public safety demands some minimal intrusion, such as the use of an airport magnetometer. Both the Fifth and the Second Circuits have considered a series of cases in which airport security officers conducted warrantless searches of suspected skyjackers. In *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973), the Fifth Circuit applied the rationale of *Terry* to uphold an airport stop of an individual who had been observed for several hours behaving in a suspicious manner. The court stated:

> Although the personal safety of the police officer is a valid governmental interest at stake in deciding the proper scope of a warrantless airport security search, that is not the only governmental interest involved. Of equal importance to airport security searches is the central purpose of thwarting air piracy which often involves the safety of passengers and crew on tremendous aircraft after the plane is airborne with a heavy cargo. At this point in time the security officer is usually safe in the airport. However, the "others" involved, the passengers and the crew, are in the air. 475 F.2d at 47.

The court went on to suggest a balancing test:

> In cases such as this one, where a warrantless search is conducted, it is necessary to strike a cautious balance between the competing interests of law enforcement and the right of the individual to be left alone. In doing this, we must be mindful of the fact that the constitution does not forbid all searches and seizures, only unreasonable ones. 475 F.2d at 49–50.

In *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973), the court expanded on the balancing of interests underlying *Moreno.* The court observed:

> Bitter experience has taught us that the physical dangers of mass kidnapping and extortion posed by air piracy are even greater than the dangers against which the usual border search is directed. Necessity alone, however, whether produced by danger or otherwise, does not in itself make all non-probable-cause searches reasonable. Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting the potential harm. On the opposite balance we must evaluate the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails. 482 F.2d at 1275.

The court went on to emphasize that the intrusion of the airport search is somewhat mitigated by the fact that the passenger has the option of avoiding the search by choosing not to board the plane and that the search is generally conducted in the public view. This latter factor was thought to be a safeguard against possible police abuses in conducting the search:

In addition, the offensiveness of the screening process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public. 482 F.2d at 1275–76.

The Second Circuit has similarly upheld a number of airport searches and seizures under the reasonableness clause of the Fourth Amendment. *United States v. Bell,* 464 F.2d 667 (2nd Cir. 1972); *United States v. Riggs,* 474 F.2d 699 (2nd Cir. 1973). In *United States v. Ruiz-Estrella,* 481 F.2d 723 (2nd Cir. 1973), however, the court agreed to suppress the evidence gleaned from the search of a suspect who fit the skyjacking profile and had produced marginally questionable identification. The court stated that these facts did not constitute "compelling circumstances" to justify the search of the passenger's bag. 481 F.2d at 729. Furthermore, if one of the mitigating factors supporting airport searches is the passenger's awareness that he can avoid the search by choosing not to board the aircraft, then this defendant's unawareness of such an option further tainted the search.

█ The sum and substance of the airport search cases is to raise a cautionary note even as the rationale of *Terry* is extended. While public safety demands some intrusion into the privacy of air passengers, some reasonable suspicion of illegal activity is required before a passenger may be lawfully subjected to a search. Moreover, the new program of drug enforcement at Metropolitan Airport is not supported by the same concerns for public safety which underlie the anti-skyjacking measures. In a recent opinion involving the airport program, Judge Joiner of this court observed:

As damnable as drug traffic is, its regulation involves the protection of no special public interests like those at play in airport security. Regulation of drug traffic is achieved through enforcement of laws adopted by Congress which are similar to laws prohibiting bank robbery, bribery, or conspiracy. Thus, the court perceives no fundamental public interest at stake in routine enforcement of the drug laws which calls for the development of rules unique to airport drug searches. Accordingly, the government's rights in these cases must be tested against basic Fourth Amendment principles rather than by rules derived from an air piracy context. *United States v. Van Lewis,* 409 F.Supp. 535, 542 (E.D.Mich.1976).

It is clear that the balancing approach developed by the anti-skyjacking cases must be tempered with the awareness that the exigencies of public safety are not nearly so great in the drug enforcement operation.

The border search cases present another area which bears upon the reasonableness of the stop and search program of drug enforcement. While a number of courts have considered the issues raised in border searches in recent years, those issues were most cogently resolved in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1974).

While section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1) authorizes warrantless interrogations of "any alien or person believed to be an alien as to his right to be or to remain in the United States," the court held in *Brignoni-Ponce* that the Fourth Amendment does not allow a roving patrol to stop a vehicle near the Mexican border and question its occupants about their citizenship and immigration status when the only ground for suspicion is that the occupants appear to be of Mexican ancestry. The court discussed at some length the potential intrusion on normal traffic which would accompany a program of random stops:

We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable sus-

picion to justify roving patrol stops. In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the government. Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. San Diego, with a metropolitan population of 1.4 million, is located on the border. Texas has two fairly large metropolitan areas directly on the border: El Paso, with a population of 360,000, and the Brownsville-McAllen area, with a combined population of 320,000. We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens. To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. 422 U.S. at 882, 95 S.Ct. at 2580–2581.

Furthermore, the court declined to approve even a limited identification stop unless the Border Patrol could point to specific factors indicating that the person in question might be an alien:

> The Government also contends that the public interest in enforcing conditions on legal alien entry justifies stopping persons who may be aliens for questioning about their citizenship and immigration status. Although we may assume for purposes of this case that the broad congressional power over immigration . . authorizes Congress to admit aliens on condition that they will submit to reasonable questioning about their right to be and remain in the country, this power cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens. For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens. 422 U.S. at 883–884, 95 S.Ct. at 2581–82.

Thus, even at an international border, an area clearly singled out for additional surveillance, the Fourth Amendment prohibits identification stops by roving patrols which are not based upon an articulable suspicion of illegal activity.[6] Similarly,

6. The recent decision in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) does not diminish the importance of *Brignoni-Ponce*. That case held that a border patrol interrogation stop at a reasonably located fixed checkpoint need not be justified by a reasonable suspicion that the vehicle contains illegal aliens. The court was careful, however, to distinguish the checkpoint case from the random roving-patrol stops in *Brignoni-Ponce*:

> Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.

> The defendants arrested at the San Clemente checkpoint suggest that its operation involves a significant extra element of intrusiveness in that only a small percentage of cars are referred to the secondary inspection area thereby "stigmatizing" those diverted and reducing the assurances provided by equal treatment of all motorists. We think

the serious nature of the drug problem in Detroit cannot justify even an identification stop without reasonable grounds to believe that the person in question is a drug courier. The characteristics which drew attention to defendant Rogers simply are not sufficient. They reduce to the fact that he had taken a direct flight from Los Angeles with little luggage and was observed to be glancing around nervously. The agents themselves testified that it is not at all unusual for a passenger to carry only a garment bag; in fact, the high volume of commuter traffic in and out of Detroit would make this a common occurrence. Moreover, while it is certainly possible that a trained narcotics agent could distinguish between a passenger glancing around nervously to escape detection and one who is merely disoriented in disembarking at a strange airport, that distinction is not articulable enough to warrant an identification stop.

■ The government contends, however, that even if the stop is illegal, its taint is purged by defendant's consent to the search of his bags. That argument is without merit. The rationale of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), generally requires the suppression of evidence seized as the result of illegal Fourth Amendment activity. The court in *Wong Sun* indicated that any evidence which has been seized through an exploitation of an illegal search or seizure, rather than through some independent act of free will, must be suppressed. 371 U.S. at 488, 83 S.Ct. 407. The rule of *Wong Sun* was recently applied by the Sixth Circuit in *Manning v. Jarnigan,* 501 F.2d 408 (6th Cir. 1974):

We believe . . . in view of the deterrent purposes of the exclusionary rule . . . any illegal arrest must require suppression of the evidence subsequently seized as a result under the rationale of *Wong Sun v. United States* . . . . 501 F.2d at 411.

The court went on to cite a recent case from the Ninth Circuit to support the suppression:

Also applicable to our instant case is a recent case from the Ninth Circuit. In *United States v. Mallides,* 473 F.2d 859 (9th Cir. 1973), there was testimony that after a stop held by the court to be completely without probable cause, Mallides gave permission to examine the trunk which resulted in damaging evidence which was admitted at trial. The Court of Appeals reversed for dismissal of the indictment, holding:

"Neither the Supreme Court nor this court has ever upheld the legality of a detention based upon an officer's unsupported intuition, and we refuse to do so now.

The stop and detention were illegal, and the fruit of the illegal conduct was inadmissible." 501 F.2d at 411–12.

The government argues, however, that the consent was an act of free will sufficient to purge the evidence of its primary taint. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the court established that "whether a consent to a search (is) in fact 'voluntary' or (is) the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." There is some dispute in this record whether defendant Rogers will-

defendants overstate the consequences. Referrals are made for the sole purpose of conducting a routine and limited inquiry into residence status that cannot feasibly be made of every motorist where the traffic is heavy. The objective intrusion of the stop and inquiry thus remains minimal. Selective referral may involve some annoyance, but it remains true that the stops should not be frightening or offensive because of their public and relatively routine nature. Moreover, selective referrals—rather than questioning

the occupants of every car—tend to advance some Fourth Amendment interests by minimizing the intrusion on the general motoring public.

The factors emphasized by the court: minimal interference with legitimate traffic, a lesser degree of discretionary enforcement activity, and the public and routine nature of the stops are not factors supporting the intrusion in the airport search cases. The airport search much more closely resembles a roving patrol than a fixed checkpoint "seizure."

ingly accompanied the agents to the enclosed hallway or was led to believe he would be formally arrested if he did not go along. Moreover, the extent to which he consented to Agent Back's search of the garment bag and the circumstances surrounding that consent are also in question. Agent Back testified that Rogers was aware of his right to refuse and unzipped the bag all the way down; Rogers testified that he was not aware of his right to refuse until Back was himself unzipping and searching the bag. All parties do agree that Rogers did show some reluctance in that his initial reaction to Back's request was to rifle through the contents himself as if to indicate nothing was amiss. Back had to insist a second time that he wanted to search the bag himself. Under these circumstances, this court cannot agree that the consent given was sufficiently voluntary to purge the taint of the illegal stop. In *Schneckloth,* the court observed:

> In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. 412 U.S. at 229, 93 S.Ct. at 2049.

The court also noted that custodial surroundings produce an inherently coercive situation. 412 U.S. at 247, 93 S.Ct. 2041. These observations were the basis of a Ninth Circuit rejection of a consent argument in *United States v. Rothman,* 492 F.2d 1260 (9th Cir. 1973).

While the extent to which defendant Rogers willingly permitted Agent Back to search his garment bag is unclear, this court must find that the consent was not a strong affirmative act of free will sufficient to purge the taint of the illegal stop. Had the stop itself been reasonable under the standards of the Fourth Amendment, the balance might yield a different result. To overcome illegal Fourth Amendment activity, however, the government must demonstrate something more than a grudging acquiescence to the insistence of the agents. For the reasons stated herein, the defendant's Motion to Suppress the Evidence found during the search of his garment bag is granted.

An appropriate order shall be entered.