UNITED STATES of America

v.

Carlos WESTERBANN–MARTINEZ and
Luis Angel Torres, Defendants.

No. 77–CR–286.

United States District Court,
E. D. New York.

July 19, 1977.

David G. Trager, U. S. Atty., E.D.N.Y. by Richard S. Berne, Asst. U. S. Atty., for U. S.

James V. McGovern, New York City, for defendant Westerbann-Martinez.

Marion Seltzer, Fed. Defender Unit, The Legal Aid Society, Brooklyn, N.Y., for defendant Torres.

COSTANTINO, District Judge.

It was a maxim with Foxey . . . "Always suspect everybody."

Dickens, *The Old Curiosity Shop.* (1841)

The motions to suppress in this case provide an opportunity to re-emphasize that something more than reliance on "Foxey's maxim" is necessary to sustain the propriety of an investigative stop.

American Airlines Flight 492 originates in Chicago and terminates in New York LaGuardia Airport after a stop in Cincinnati. When they deplaned from Flight 492 at LaGuardia, on March 29, 1977, Carlos Westerbann-Martinez (hereinafter Westerbann) and Luis Angel Torres, two casually dressed Hispanics, glanced about the airport. It was the way in which they were looking around that first attracted the attention of Agent Arthur Rose and led him to conclude that they were nervous. Agent Rose had been assigned to LaGuardia Airport as part of a Drug Enforcement Administration narcotics detection program. Rose and his partner were there to observe passengers in order to "look for any suspicious traits . . . which we believe are traits that are exhibited by narcotics couriers." (Tr. 1.7). Among the factors that Rose was looking for are those contained in a Drug Courier Profile compiled by the Drug Enforcement Administration.[1] According to Agent Rose, these factors include (1) people travelling from a source city,[2] (2) people who are Hispanics (especially Mexicans), (3) people travelling long distances with little luggage, (4) people who are together but appear not to be together, and (5) people

1. See this opinion, *infra*, at 698.

2. Rose testified that Chicago had been designated as a "primary source city" for contra- band narcotics. No evidence at all was offered to support this designation.

who are nervous (and look around the airport in a suspicious manner). (Tr. 2.5, 2.58).

Having first noticed Torres and Westerbann as a result of their nervous "scanning" of the arrival area, Rose then decided that their Hispanic appearance and casual dress made them worth watching. Although Rose felt that they might be together, they did not converse. Nor did Torres, who had exited the plane after Westerbann, ever draw abreast of Westerbann during the 3–4 minute walk to the outside of the terminal. According to Rose, both defendants "repeatedly looked behind them during this walk." (Tr. 1.9). After the defendants reached the outside of the terminal Torres drew abreast of Westerbann and they began conversing while they waited in the taxi line.

Based on their observations of the defendants up to this point, Rose and his partner apparently concluded that there was a reasonable basis for suspecting that defendants were drug couriers. The agents therefore approached defendants, identified themselves, and asked the defendants where they had come from. The defendants truthfully replied that they had come from Chicago. Defendants were then asked for their tickets, which they produced and which confirmed that they had indeed arrived from Chicago. Both tickets were made out in defendants' own names. Rose noticed however that both tickets were paid for by Torres with an expired American Airlines credit card. Rose then asked both men for identification. Westerbann replied that he had no identification with him; Torres produced several valid forms of identification. At this time, Rose noticed needle tracks and tatoos (similar to those sometimes used by addicts to hide needle tracks) on Torres' hands. Torres appeared to Rose to be "shaking visibly."

Agent Rose testified that in order to remove Torres and Westerbann from blocking the taxi line, he then asked them to accompany him back into the terminal. He further testified that at that point he intended to inquire further into the fact that the tickets were paid for with an expired credit card and the fact that Westerbann had no identification. Rose however did nothing to check into the expired credit card once inside the terminal,[3] but continued to press Westerbann concerning his lack of identification. In point of fact he asked Westerbann several times whether Westerbann had any identification and each time Westerbann replied in the negative. Despite these replies, Rose asked Westerbann if he had any identification in the bag he was carrying. According to Rose, Westerbann replied "You can look if you want." (Tr. 1.17). Rose testified that while he was looking through the bag, his partner again asked Westerbann for identification. In response, Westerbann reached into his pocket, withdrew what appeared to be a marijuana cigarette and then quickly replaced it.

When Agent Rose opened Westerbann's bag, he found it stuffed with several white towels. He reached into the bag and beneath the towels he touched a paper bag which felt as if it contained a powdery substance. He testified that he knew that the paper did not contain identification. Rose nevertheless took the paper bag from the luggage, opened it and found a plastic bag inside which appeared to contain heroin. At that point both defendants were placed under arrest. The defendants were then taken to the Port Authority police office at LaGuardia Airport where Torres was given his *Miranda* warnings [4] and both defendants were searched. The search revealed that Torres was carrying an additional quantity of heroin and Westerbann was carrying marijuana. Subsequently, Torres made a statement detailing his involvement and that of Westerbann in the transportation of the heroin.

Defendants contend that the heroin seized must be suppressed since (1) the orig-

---

**3.** At one point in the testimony, Rose acknowledged that "I wasn't going to arrest him for that ticket, no." (Tr. 2.26).

**4.** Because he had difficulty understanding English, Westerbann was not given his *Miranda* warnings until a Spanish speaking interpreter was available.

inal stop of Torres and Westerbann violated the Fourth Amendment, and (2) Westerbann's consent to search his bag was limited, and in any event not voluntarily given. They also contend that Torres' incriminating statement must be suppressed as "fruit of the poisonous tree."

The government initially contends that Torres lacks standing to object to evidence seized from Westerbann. In addition the government argues that the initial stop was a proper investigative stop in accordance with the rationale of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny; furthermore the government contends that defendant Westerbann's consent to the search of his bag and defendant Torres' statement were both voluntarily given and purged the taint of any illegality which might have arisen out of the initial stop.

## I. STANDING

The government argues that Torres lacks automatic standing to object to the seizure of the heroin from Westerbann on the grounds that none of the charges in the indictment include possession as an "essential" element of the crime charged. *See Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Brown v.*

*United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

As to the first count, the government's contention is without merit.[5] One who is charged with aiding and abetting the commission of a substantive offense is in the same position for purposes of determining standing to suppress as one who is directly charged with the substantive offense. *United States v. Oates,* 560 F.2d 45, 55 (2d Cir. 1977). The substantive crime charged in Count One includes possession as an essential element of the offense. *See United States v. Mapp,* 476 F.2d 67 (2d Cir. 1973). Therefore Torres has automatic standing to object to the introduction of the heroin seized from Westerbann. *See Jones v. United States, supra; Brown v. United States, supra.*

Torres does not, however, have automatic standing on Count Two[6] (the conspiracy count) to object to the seizure from Westerbann, since possession is neither a *sufficient* nor a *necessary* element of the conspiracy offense. *United States v. Oates, supra,* n.6, 55–56; *United States v. Galante,* 547 F.2d 733 (2d Cir. 1976); *United States v. Sacco,* 436 F.2d 780 (2d Cir.), *cert. denied,* 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971). For the same reasons, it would appear that Torres lacks automatic standing under Count Three[7] (the Interstate Travel

---

**5.** Count One charges:

On or about the 29th day of March, 1977 within the Eastern District of New York, the defendants CARLOS WESTERBANN–MARTINEZ and LUIS ANGEL TORRES did knowingly and intentionally possess with intent to distribute approximately one kilogram of heroin hydrochloride, a Schedule I narcotic drug controlled substance. (Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2).

**6.** Count Two charges:

From on or about and between the 23rd day of March, 1977 and the 29th day of March, 1977, both dates being approximate and inclusive within the Eastern District of New York and elsewhere, the defendants CARLOS WESTERBANN–MARTINEZ and LUIS ANGEL TORRES did wilfully, knowingly and unlawfully conspire to distribute and possess with intent to distribute approximately one kilogram of heroin hydrochloride, a Schedule I narcotic drug controlled substance, in violation of Title

21, United States Code, Section 841(a)(1). (Title 21, United States Code Section 846).

**7.** Count Three charges:

On or about March 29, 1977 within the Eastern District of New York and elsewhere, the defendants CARLOS WESTERBANN–MARTINEZ and LUIS ANGEL TORRES did wilfully and knowingly travel in interstate commerce from Chicago, State of Illinois to New York City, State of New York, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being the knowing and intentional possession with intent to distribute approximately one kilogram of heroin hydrochloride, a Schedule I narcotic drug controlled substance in violation of Title 21, United States Code, Section 841(a)(1), and thereafter to perform and attempt to perform acts to promote, manage, and carry on and facilitate the promotion, management, and carrying on of said unlawful activity. (Title 18, United States Code, Section 1952(a)(3) and Section 2).

Act). *Cf. United States v. Colacurcio,* 499 F.2d 1401 (9th Cir. 1974) (where, however, unlike the charge in this case, the underlying act charged did not bear any relation whatsoever to a possessory offense).[8]

■ Although he does not have automatic standing on those counts, defendant Torres does have *actual* standing on Counts Two and Three to object to the seizure. Standing to object to a search and seizure may be based upon presence at the time of the search. *United States v. Galante,* 547 F.2d 733, 739; *cf. Brown v. United States, supra,* 411 U.S. at 229, 93 S.Ct. 1565, and there is no dispute that Torres was present during the search of Westerbann. The government argues, however, that since the search occurred in a public airline terminal, Torres had no reasonable expectation of privacy. This argument ignores the fact that the Fourth Amendment protects "people not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Constitutional protection of privacy under the Fourth Amendment is not lost "even in an area accessible to the public." *Id.* 351–352, 88 S.Ct. 511. The "inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio, supra,* 392 U.S. at 8–9, 88 S.Ct. at 1873.

Furthermore, Torres has actual standing on Counts Two and Three for other reasons. When Rose stopped Torres and Westerbann for questioning, he restrained their freedom to walk away, and thereby "seized" both defendants within the meaning of the Fourth Amendment. *Terry v. Ohio, supra* at 16–19, 88 S.Ct. 1868; *United States v. Brignoni Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. `Chamblis,* 425 F.Supp. 1330, 1332 (E.D. Mich.1977); *United States v. Pruss,* 5–81244 (E.D.Mich. Jan.14, 1976), *aff'd,* 542 F.2d 1177 (6th Cir. 1976).

Both Torres and Westerbann were "seized" simultaneously. That "seizure" was based to a large extent upon Agent Rose's interpretation of the interaction of Torres and Westerbann including what Rose thought to be their desire to avoid the appearance of being together in the terminal, followed by their conversation once outside the terminal. Both Torres and Westerbann were questioned together. And it was the search of Westerbann's bag and seizure of heroin therefrom, that led immediately and directly to Torres' arrest. It is clear that Rose did not view Torres and Westerbann individually or separately but rather collectively—in a certain sense he viewed them as a unit. Therefore, Torres was the "victim of an invasion of privacy", *Jones v. United States, supra* 362 U.S. at 261, 80 S Ct. at 731; *Alderman v. United States,* 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and therefore has standing to object to the "seizure" itself and the introduction into evidence of any "fruits of its poisonous tree" including the heroin seized from Westerbann's bag. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[9]

8. There may be persuasive reasons for finding automatic standing in this case under § 1952. Among other things a conviction under that section requires proof of performance or an attempt to perform the proscribed activity specified in the indictment. *United States v. Prince,* 529 F.2d 1108, 1111 (6th Cir.), *reh. denied* (1976). In the case now before this court, therefore, the indictment arguably *requires* proof of either (1) possession, or (2) attempted possession of heroin. Although the broad language in the statute speaks in terms of "promot[ing]" and "facilitat[ing]" the unlawful activity—crimes for which actual possession is arguably neither *necessary* nor *sufficient*—when the government's proof will establish actual possession as part of the crime

that was committed, there are persuasive reasons for concluding that the defendant's automatic standing should not be defeated by the mere fact that the indictment superfluously tracks the language of the statute. Since this court concludes that Torres has actual standing on Count Three, it is not necessary to resolve this issue.

9. Because Torres has actual standing under Counts Two and Three it is not necessary to face the complex problem arising from a finding of no standing as to some counts, but finding standing as to others, and granting suppression. *See United States v. Oates, supra,* at 56, n. 7; *United States v. Braverman,* Slip op. 2513, 2517, n. 3 (2d Cir. 1973); *United States v.*

## II. FOURTH AMENDMENT ISSUES

■ The mere fact that defendants were "seized" within the meaning of the Fourth Amendment does not, of course, automatically entitle them to a grant of their suppression motion. The Fourth Amendment does not prohibit *all* searches and seizures but merely unreasonable searches and seizures. *Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The Second Circuit Court of Appeals has recently articulated the factors to be considered in determining the reasonableness of an investigative stop:

> It is now axiomatic that a law enforcement officer has the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime. [citations omitted] To establish the constitutionality of the stop, however, the "officer [must be able to] point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion." [citations omitted] Inasmuch as "[t]he reasonableness of [the officer's] conduct must be determined by balancing the need for the stop against the gravity of the intrusion which the stop entailed," [citations omitted], it is readily apparent that the "specific and articulable facts" and the inferences that can be drawn from these facts relate to the need for the stop. "Need," in turn, depends on factors such as the seriousness of the offense and the likelihood of the detainee's involvement in the known or

suspected criminal activity. · [citations omitted] Obviously, if the offense is minor and there is substantial uncertainty that the detainee is involved, only a minimally intrusive stop would be proper. On the other hand, when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified. Between these two extremes lie the great majority of cases; those in which the offense is minor but there is strong suspicion that the detainee is involved, or those in which the offense is egregious but the suspicion that the prospective detainee is involved amounts to little more than a visceral feeling on the part of the police officer.

*United States v. Oates, supra*, at 58. The circumstances must be "viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his own experience and training." *United States v. Hall*, 174 U.S.App.D.C. 13, 525 F.2d 857 (1976). Despite the "inherent odiousness and gravity of the [heroin] offense [10] the agent must still rely on "specific and articulable facts" logically indicating the possibility that defendants were involved in narcotics trafficking. *United States v. Oates, supra* at 59.

While the inquiry into "reasonable suspicion" must necessarily be pursued on a case-by-case basis, *United States v. Ruiz-Estrella*, 481 F.2d 723 (2d Cir. 1973), it will be helpful to examine the approach taken by the Second Circuit Court of Ap-

---

*Galante, supra* at 740, n. 13. Compare the majority opinion and the dissenting opinion (Hufstedler J.) in *United States v. Prueitt*, 540 F.2d 995 (9th Cir.), *reh.* and *reh. en banc denied* (1976).

**10.** Compare the need present in an airport search of a suspected heroin smuggler with the need present when air piracy is suspected:

> As damnable as drug traffic is, its regulation involves the protection of no special public interests like those at play in airport security. Regulation of drug traffic is achieved through enforcement of laws adopted by Congress which are similar to laws

prohibiting bank robbery, bribery, or conspiracy. Thus, the court perceives no fundamental public interest at stake in routine enforcement of the drug laws which calls for the development of rules unique to airport drug searches. Accordingly, the government's rights in these cases must be tested against basic Fourth Amendment principles rather than by rules derived from an air piracy context.

*United States v. Van Lewis*, 409 F.Supp. 535, 542 (E.D.Mich.1976), *rev'd on other grounds sub nom., United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977).

peals in two recent cases—*United States v. Oates, supra* and *United States v. Magda,* 547 F.2d 756.

The agent who made the stop in *Oates* had observed the defendant for a period of more than three hours on two consecutive days. In finding that the stop was permissible under *Terry,* the court relied on the following factors known to the agents prior to the stop:

(1) The agent was thoroughly familiar with the defendant's reputation as a *major* narcotics *dealer* (emphasis Court of Appeals);

(2) The defendant was apparently travelling from Detroit to New York with a person who was "obviously" a narcotics addict;

(3) After arriving in New York, both men then met a third person at the airport who was known personally to the agent as "being involved in the drug culture";

(4) Neither of the men carried luggage;

(5) The men remained in New York for only nine hours (from 10 p.m. to 8 a.m. the next morning) returning to Detroit on a "virtually immediate" return flight;

(6) One of the men had distinct bulges in his clothing in the morning, although he had not had any such bulges the night before;

(7) At the airport the next morning the two men while waiting for the next flight remained apart and studiously avoided giving any appearance of knowing each other—despite the fact that, as the agent was aware, the two men did know each other (the previous evening the agent had observed them speak together in Detroit prior to flying to New York, they had flown to New York on the same flight, had rejoined in New York after the flight, had then resumed their conversation, and of course had re-appeared the next morning to take the same return flight);

(8) Both men gave the appearance of being nervous and jittery, which "*in connection* with the other circumstances" might reasonably indicate illegal conduct. *United States v. Oates, supra,* at 60 (emphasis added). The court was satisfied that the

large number of interrelated factors was *not* coincidence, and their combination was sufficient to raise a reasonable suspicion in the agent's mind. *United States v. Oates, supra,* at 61.

If the factual situation in *Oates* represents a clear example of reasonable suspicion, the decision in *United States v. Magda* probably represents the minimum interplay of elements needed to establish reasonable suspicion under *Terry. See United States v. Magda, supra,* at 759 (Motley, J., dissenting).

In *Magda,* a New York City policeman with eleven years experience (including 3½ years as a foot patrolman and ½-year experience in the specific area involved) was patrolling an area notorious as a center for drug traffic. From a distance of about 35 feet he saw the defendant and another man exchange something. After the exchange the other man noticed the officer and rapidly left the scene. The defendant also left the scene, whereupon the policeman stopped him to inquire as to what he had seen. Magda claimed that nothing happened. When asked a second time, Magda admitted to buying a marijuana cigarette. He was then placed under arrest and searched.

In upholding the search, the court relied on the exchange, the rapid departure of defendant's companion, the locality, and the very limited nature of the stop itself. *United States v. Magda, supra,* at 759.

Viewed in light of *Oates* and *Magda* the stop in this case was improper. The government argues (Memorandum of Law, p. 12) that the following factors, when viewed through the eyes of the agent meet the test of reasonable suspicion; especially in light of the presence of these factors in the "Drug Courier Profile":

(1) defendants' arrival from a primary source city;

(2) defendants' nervous scanning of the area;

(3) defendants' failure to speak to one another as they proceeded down the corridor as if to create the impression they were

not together, followed by a conversation between them immediately upon exiting the terminal;

(4) defendants' failure to claim any luggage.

■ The "Drug Courier Profile" which Agent Rose allegedly relied upon in stopping Torres and Westerbann, is not a "talisman"; its use does not obviate the need for traditional analysis. *United States v. Chamblis*, 425 F.Supp. 1330 (E.D.Mich. 1977). Firstly, no evidence was offered in support of the accuracy of the profile. Secondly, the profile has a chameleon-like quality; it seems to change itself to fit the facts of each case. One agent candidly admitted that "the profile in a particular case consists of anything that arouses his suspicions." *United States v. Chamblis, supra*, at 1333.

Many of the factors alleged in other cases to be part of the drug courier profile were neither mentioned nor present in this case. Among those factors are: (1) making a phone call immediately after arriving at the airport, *United States v. Chamblis, supra; United States v. Endia Allen*, 421 F.Supp. 1372 (E.D.Mich.1976); (2) exiting at a level of the airport where there is no access to public transportation, *United States v. Chamblis, supra*, (3) being the last person to deplane, *United States v. Mendenhall*, No. 6–80208 (E.D.Mich. Nov. 18, 1976); (4) changing planes or airlines en route without apparent justification, or taking a circuitous route, *United States v. Mendenhall, supra; United States v. Daniels*, No. 6–80613 (E.D.Mich. October 8, 1976); (5) entering a rest room for a brief period of time, *United States v. Frost*, No. 6–80842 (E.D.Mich. Sept. 30, 1976); (6) not having a ticket folder, *United States v. Tyronne Allen*, No. 76–471 (E.D.La. September 17, 1976); (7) travelling under an alias, *United States v. Tyronne Allen, supra; United States v. Endia Allen, supra; United States v. Van Lewis*, 409 F.Supp. 535 (E.D.Mich. 1976), *rev'd sub nom., United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977); (8) not having an FAA required name tag on luggage, *United States v. Tyronne Allen,*

*supra*; (9) possessing a large quantity of cash, *United States v. Pruss, supra*; (10) paying for a plane ticket with small currency, *United States v. Endia Allen, supra; United States v. Van Lewis, supra*; (11) using a false telephone number to make airline reservations, *United States v. Endia Allen, supra*; (12) meeting known drug dealers, *United States v. Endia Allen, supra*.

Agent Rose, in this case, specifically denied that being the last to deplane (see no. 3 above) and taking a circuitous route (see no. 4 above) were part of the profile (Tr. 2.9, 2.17). He had no knowledge whether the use of small denomination currency (see no. 10 above) was part of the profile (Tr. 2.6). On the other hand, while Agent Rose testified that being Hispanic was part of the profile, that factor was not mentioned in any of the other cases.

■ Giving the government the benefit of the doubt, this court must conclude that either the "Drug Courier Profile" is too amorphous and unreliable to be of any help, or that there is a tremendous lack of communication within the Drug Enforcement Administration as to the factors in the profile. In either event use of the words "drug courier profile," under these circumstances, adds nothing to the factors observed; those factors must rise to the level of reasonable suspicion—or fall to the level of a mere hunch—on their own. *Cf. United States v. McCaleb, supra*, at 720. In order to assess the combined impact of these factors it is essential to examine the factors individually.

1. Arrival from a primary source city.

Although Chicago has been classified as a primary source city, no evidence was introduced in support of that classification. It appears safe to assume that the overwhelming percentage of travelers from Chicago are not in any way connected with the heroin trade. *Cf. United States v. Brignoni Ponce, supra*, 422 U.S. at 882, 95 S.Ct. at 2581:

We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens.

Thus at most this factor would normally be an "add-on factor" which might have some slight meaning in the presence of other, stronger indicia of criminal activity. Whatever slight add-on value it might have normally, however, is even more diluted in this case. As noted before, Flight 492 originated in Chicago and stopped in Cincinnati before arriving in New York. Rose admitted at the hearing held by this court that prior to stopping Westerbann and Torres, he did not even know whether they had boarded the plane in the "primary source city"—Chicago—or whether they had boarded the plane in Cincinnati.

2. Nervous scanning of the area.

In describing his conclusion that defendants were looking about "nervously" Agent Rose testified:

> When a person looks to see if somebody is there to pick them up, they pick them up right away. These people turned around and looked for people over and over again. They looked as though they were looking to see if they were watched. (Tr. 1.34–1.35).

When pressed as to how the "look" would be different "if you are looking for someone who is not there, like a person who is supposed to pick you up and is not there?" the agent admitted: "*I can't really answer that.*" (Tr. 1.36 emphasis added). Agent Rose's testimony on this point is therefore far from conclusive. It is true that in *United States v. Oates* the court found that *in connection with* other factors known to an agent, a person's nervous and jittery behavior may contribute to a reasonable suspicion. *United States v. Oates, supra* at 60. The circumstances in *Oates*, however, are vastly different from those present here.

Moreover, apparent nervousness in an airport is not necessarily a sign of suspicious behavior; it may result from an in-nate personality syndrome, or from a disorientation from fear of flying or from having disembarked at a strange airport. *See United States v. Floyd*, 418 F.Supp. 724, 728 (E.D.Mich.1976). Although "it is certainly possible that a trained narcotics agent could distinguish between a passenger glancing around nervously to escape detection and one who is merely disoriented in disembarking at a strange airport," this court must conclude, in light of all the circumstances present here, including the equivocal testimony of Agent Rose that "that distinction is not articulable enough to warrant an identification stop" without stronger corroborating factors than are present in this case. *See United States v. Mico Rachelle Rogers*, 436 F.Supp. 1 at 7. No. 6–80162 (E.D.Mich. July 15, 1976).

The danger in placing too much reliance on an agent's perception as to the nature of a person's attitude is that in the absence of stronger objective evidence than that present here, to do so would be to short-circuit the requirement of "specific and articulable facts and inferences therefrom to support an investigative stop." *See Terry v. Ohio, supra*. This court is not prepared to usher in the day in this country when, without stronger objective incriminatory evidence, any person may be subject to a police stop after arriving by plane in an airport merely because an agent subjectively concludes that repeated looking around is a manifestation of nervousness. It is not too difficult to see the eventual result of such a decision. When it becomes known that looking around will justify a conclusion of nervousness which in turn may justify an investigative stop, narcotics couriers will then deplane and proceed to their destinations without looking around. At that point, the government will presumably argue that people who look straight ahead after deplaning are subject to investigative stops. *Cf. United States v. Mallides*, 473 F.2d 859 (9th Cir.), *reh. denied* (1973) (occupants of automobile were "sitting very erect" and "did not turn to look at the marked patrol car as it passed"), 473 F.2d, at 860; *United States v. Himmelwright*, 551 F.2d 991, 992, n. 1 (5th Cir. 1977) (agent's

attention directed at defendant because she appeared "extremely calm"). If this result is eventually to occur, it will have to be based on the authority of another court; this court will not "rubber-stamp" the vague suspicion of nervousness in this case.

3. Defendants' failure to speak to one another as they proceeded down the corridor as if to create the impression that they were not together, followed by a conversation between them immediately upon exiting the terminal.

An attempt to create the false impression of not being with someone may under certain circumstances properly constitute a factor upon which reasonable suspicion may be based. *United States v. Oates, supra,* at 60; *United States v. Riggs,* 474 F.2d 699 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); *United States v. Fields,* 458 F.2d 1194 (3d Cir. 1972), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973). In *Oates* and *Riggs,* the suspects were "apparently avoiding" each other in a situation where they would normally be expected to be together—waiting in the same vicinity to board the same flight. Moreover, in both of those cases the agents had independent knowledge that they were together. In *Fields* the suspects were observed over a period of more than 30 minutes during which they avoided speaking.

The facts in this case are far different. Firstly, the agent did not have any prior knowledge that the two were together. (He had not previously seen them together as in *Oates* and *Riggs,* nor did he have any independent information as in *Fields*). He merely assumed that they were together because they were both dressed casually. It was not until they drew abreast and began talking outside the terminal that one could reasonably conclude that they might have been together (although the conversation could also have been between two strangers, one of whom, for example, was seeking information about ground transportation).

Assuming that the agent did have reason to suspect that defendants were travelling together before he stopped them, the events which occurred hardly warrant the conclusion that they were avoiding each other. The total amount of time needed to transverse the terminal was 3–4 minutes (Tr. 2.41). There is nothing particularly suspicious about the fact that people who have taken a long trip do not speak to each other for 3–4 minutes. Nor is it necessarily suspicious that two people walking over a short distance do not walk side by side. Thus the agent's conclusion in this case is based on much weaker evidence than was present in *Oates, Fields* or *Riggs.* Although the behavior exhibited here may be slightly unusual in the absence of other factors the conclusion that the defendants attempted to create an impression of not being together, while entitled to some weight in light of the agent's experience, is certainly not compelling.

4. Failure to claim any baggage.

Although neither of the defendants claimed any baggage, Agent Rose acknowledged that Westerbann was carrying an overnight bag and Torres was carrying a garment bag. The overnight bag, moreover, as Rose's search later revealed, was not empty. Since Flight 492 was a morning flight from Chicago to New York and defendants may only have been staying in New York overnight, there is nothing suspicious or unusual about the amount of luggage they were carrying. *Cf. United States v. Floyd, supra,* at 728; *United States v. Chamblis, supra; United States v. Mico Rachelle Rogers, supra; United States v. Floyd, supra.*

Having concluded that individually, the factors present here are not by themselves "specific and articulable" facts upon which to base a reasonable suspicion, the court must still determine whether, when viewed collectively, they amount to a reasonable suspicion. They do not.[11] Normally, noth-

11. Although the agent apparently relied to some extent on the fact that defendants were

Hispanic, the government did not, in its brief, press this point. In any event this factor does

ing plus nothing equals nothing. Such is the case here.

In *Magda,* the factors present, although not individually sufficient to lead to a reasonable suspicion, synergistically combined to produce a reasonable suspicion. In *Magda* the agent viewed a *specific act* which, while arguably susceptible to innocent interpretation, was also arguably susceptible to a criminal interpretation. In light of the neighborhood and the actions of the suspect after seeing the policeman, the court found "specific and articulable facts" upon which to base a reasonable suspicion. In the case at bar, Rose did not observe any *specific act* whatsoever that might have been criminal; all he observed were certain secondary characteristics which appeared to him to be suspicious. He had no prior knowledge, nor did he recognize either of the defendants, *cf. United States v. Oates, supra.* In certain cases secondary characteristics or factors may be so unusual, *e. g., Terry v. Ohio, supra,* or so interrelated, *e. g. United States v. Oates, supra,* as to give rise to a founded suspicion. In the case at bar they were not. This court therefore concludes that the investigative stop of Torres and Westerbann unconstitutionally violated the Fourth Amendment rights of both men.[12] *Cf. United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977); *United States v. Chamblis, supra; United States v. Mico Rachelle Rogers, supra; United States v. Floyd, supra.*

As a result of the illegal stop, the defendants argue that the heroin seized and the statement given by Torres must be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v.* *Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

## III. FRUITS OF THE POISONOUS TREE

 The test in determining the admissibility of evidence garnered after illegal police actions is "whether granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint", *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417. If the evidence is seized as a result of some independent act of free will, rather than as a result of an exploitation of illegal conduct, then it is admissible, 371 U.S. at 488, 83 S.Ct. 407.

### 1. Westerbann's consent

 As to the seizure of the heroin, the government argues that Westerbann's consent to search is an intervening act of free will sufficient to "purge the primary taint of the unlawful invasion." Under the circumstances present here the government of course bears a "heavy burden of proof in establishing that the consent was the voluntary act of the arrestee and that it was not the fruit of the illegal arrest." *United States v. Bazinet,* 462 F.2d 982, 989–990 (8th Cir.), *reh. denied, cert. denied sub nom., Knox v. United States,* 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972). A determination of voluntariness cannot be based upon the presence or absence of a single controlling factor, *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); rather it must be based upon "the totality of the circumstances." *Id.* at 227, 93 S.Ct. 2041.

---

not tip the scales. Nor does the defendants' casual dress contribute toward a reasonable suspicion.

**12.** In light of the conclusion that the stop itself was improper, this court need not reach the issue of the propriety of the "scope" of the stop. *See Terry v. Ohio, supra,* 392 U.S. at 18–19, 88 S.Ct. 1868. Under the facts of this case that issue is close. On one hand, both Westerbann and Torres truthfully answered the questions put to them, the tickets were correctly made out and Torres produced valid identifi-

cation. On the other hand the tickets were paid for with an expired credit card (although Agent Rose testified that he was aware of no connection between tickets paid for with an expired credit card and drug couriers), Torres had needle marks on his hand (*cf.,* however, *United States v. Oates, supra,* n. 11, at 59: "Of course, 'need' for the stop decreases if the suspect is known as a user rather than a dealer."), and Westerbann was unable to produce identification.

 The illegality of the stop, the removal of defendants from one place to another,[13] Westerbann's difficulty in understanding English, the repetition of the request for identification four times, the failure to advise Westerbann of his rights, the limited consent by Westerbann to look in the bag for identification *only,* the agent's knowledge that the soft powdery item he removed from the bag did not contain identification (Tr. 2.34, 2.60), are all factors which militate against a finding of voluntariness. In a similar case, one court concluded its analysis of the voluntariness of a consent to search by reasoning that

> [h]ad the stop itself been reasonable under the standards of the Fourth Amendment, the balance might yield a different result. To overcome illegal Fourth Amendment activity, the government must demonstrate something more than a grudging acquiescence to the insistence of the agents. *United States v. Mico Rachelle Rogers, supra,* 436 F.Supp. 1 at 8.

In view of the circumstances present, this court concludes that the government has failed to meet its burden of proof as to voluntariness.

## 2. Torres' Statement

 The government argues that Torres' confession was made after he had received and "intelligently waived" his *Miranda* rights. (Government's Memorandum of Law, p. 20). *Miranda* warnings may be sufficient to find voluntariness or waiver of Fifth Amendment rights; in a Fourth Amendment context, however, they are only one factor to be considered in determining whether a defendant's statement was sufficiently an act of free will to purge the taint of the illegal stop. *See Brown v. Illinois, supra,* 422 U.S. at 602, 95 S.Ct. 2254. Among the other factors to be considered are the temporal proximity of the arrest and confession, the presence of intervening circumstances, and the purpose or flagrancy of the official misconduct. *Id.* at 603–604, 95 S.Ct. 2254. After reviewing the facts, this court concludes that Torres' statement was not sufficiently a product of defendant's free will to purge the taint of the illegal stop. The road to the statement from the stop "is both straight and uninterrupted," cf. *United States v. Ceccolini,* 542 F.2d 136, 142 (2d Cir. 1976), and additionally a very short road time-wise. The statement must therefore be suppressed.

\* \* \* \* \* \*

The crime charged in this case is a serious crime with grave societal consequences. This court has great respect for those law enforcement officials who are charged with the difficult task of detecting and apprehending persons involved in the drug trade. But respect for, and appreciation of, the difficulty of the task cannot in any way diminish this court's duty to uphold the constitutional rights of all citizens. As Mr. Justice Stewart recently emphasized:

> The pressures on . . . executive and judicial officers charged with the administration of the criminal law are great . . . . But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.

*Brewer v. Williams,* 430 U.S. 387, at 406, 97 S.Ct. 1232, at 1243, 51 L.Ed.2d 424 (1977).

 The guarantees embodied in the Fourth Amendment are intended to shield the citizen from unwarranted intrusions into his privacy, *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 22 L.Ed.2d 1514 (1958), and possible violations must be subjected to close judicial scrutiny. *Gilbert v. United States,* 366 F.2d 923 (9th Cir. 1966), *cert. denied,* 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967). This court must therefore be sensitive to the requirement that

---

**13.** Whether or not removal from one place to another amounts to an arrest or unjustifiable extension of the investigation, *compare United States v. Oates, supra,* at 57 (nothing wrong in moving to a more convenient place) *with United States v. Chamblis, supra,* at 1335 (extension of nature and/or time of intrusion must be based on probable cause or consent), the removal can certainly be considered as one of the factors relating to voluntariness of consent.

guesses, hunches or prejudices not be substituted for a founded suspicion of criminal activity. Circumstances otherwise innocent, may, when viewed in combination, give rise to a reasonable suspicion. *Compare Terry v. Ohio, supra; United States v. Oates, supra; United States v. Magda, supra; with Sibron·v. State of New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. McCaleb, supra; United States v. Magda, supra* (Motley, J., dissenting). In this case they do not.[14]

The motions to suppress are granted. So ordered.

---

**14.** In light of this court's determination, it is not necessary to reach defendants' other attacks upon the procedure employed here. In *United States v. Mallides,* 473 F.2d 859 (9th Cir.), reh. denied (1973) the court stated:

Neither the Supreme Court nor this court has ever upheld the legality of a detention based upon an officer's unsupported intuition, and we refuse to do so now. The stop and detention were illegal, and the fruit of the illegal conduct was inadmissable. It is unnecessary to explore the claimed overbreadth of interrogation or the trunk search.

473 F.2d at 862.