**UNITED STATES of America,
Plaintiff,**

v.

**William VAN LEWIS et al.,
Defendants.**

**Cr. A. Nos. 5–81186, 5–81723
and 5–81851.**

United States District Court,
E. D. Michigan S. D.

March 3, 1976.

John L. Christensen, Robert D. Sharp, Detroit, Mich., for the United States.

Elliott S. Hall, Detroit, Mich., for Van Lewis.

Milton R. Henry, Detroit, Mich., for Hughes.

Samuel W. Barr, Detroit, Mich., for White.

Renee S. Siegan, Detroit, Mich., for Page.

Martin S. Baum, Detroit, Mich., for McCaleb.

## OPINION AND ORDER

JOINER, District Judge.

These cases present a common problem involving three separate searches for contraband drugs at Detroit Metropolitan Airport. All defendants, charged with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), have moved to suppress evidence seized from them during the searches because of alleged violations of the Fourth Amendment.

The court conducted separate evidentiary hearings on each of these cases except the action against William Van Lewis which was heard upon the uncontested affidavit of a government agent. A common evidentiary hearing was called by the court to develop more fully the facts underlying the Drug Enforcement Administration's (DEA) efforts to stop narcotics traffic at the airport, facts which provide essential background to

defendants' motions to suppress. The record in these cases discloses the following facts both about DEA's general practices at the airport and about the specifics of the searches conducted in these cases.

*General Background*

The searches arose out of DEA efforts to intercept contraband drugs where most of it arrives for sale in Detroit. For the past 18 months, DEA has assigned a detail of highly-skilled agents, augmented by local law enforcement officers, to the airport. Beginning with one man, the detail now consists of 9 persons. DEA believes that most illegal drugs arrive in Detroit through the airport from Los Angeles, San Diego, Miami and New York. The agents assert that they have developed a method for identifying drug couriers, persons employed to carry large amounts of drugs to supply local wholesalers and major dealers.

This method involves visual observation and investigation of a particular individual and developing a sensitivity to a number of details that either increase or decrease the likelihood that a person is a courier. Agents indicate that the presence of a number of affirmative characteristics suggests that the person may be carrying contraband drugs, unless there are negative characteristics present indicating the contrary. The precise characteristics were made available to the court *in camera* in a joint hearing and counsel for all parties were given access to the information under a protective order.

Testimony taken in open court indicated that the following constitute some of the characteristics of a drug courier: (1) the use of small denomination currency for ticket purchases; (2) travel to and from major drug import centers, especially for short periods of time; (3) the absence of luggage or use of empty suitcases on trips which normally require extra clothing; and (4) travel under an alias. For purposes of this opinion, the court refers to these and other characteristics testified to in *in camera* as the "courier profile."

Agents have taught the employees of the airlines serving Los Angeles, San Diego, Miami, and New York to be alert for persons who match the profile and to notify agents when they spot such travelers. When notified, the agents use customary police procedures to learn more about the traveler.

The agents observe as many incoming flights from the four cities as time permits. They watch deplaning passengers, mindful of information given them by airline employees and the results of their police work. When they spot a suspect who matches some or all of the characteristics in the profile, they watch that person as he or she moves from the plane through the concourse to the baggage claim area and ground transportation, adding to their store of information on the individual.

Prior to the person's leaving the airport, the agents decide whether they have a founded suspicion to stop the suspect. This decision is based upon information acquired from the airline ticket agents, from their independent police work, and from their observations of the individual as he or she arrives in Detroit, in the light of the agent's accumulated knowledge and personal experience. Occasionally, anonymous tips add to the agent's knowledge of a traveler.

If agents do not have a founded suspicion that a traveler is a courier, they turn to other duties. However, if they reasonably suspect a traveler of carrying drugs, they stop the suspect and ask for identification, including among other things the ticket receipt on which he or she is traveling. The information garnered from the identification stop is added to the agent's other information about the suspect and a second decision is made. The agent at that time either sends the person on his way or informs him of his suspicion and asks him to accompany the agent to a more private place. In some instances, this is the baggage claim agent's office; in others, the first aid office. These are not private

rooms but are places somewhat removed from the hustle and bustle of the baggage claim area, the taxi entrance, and the parking area.

At that time the agent advises the suspect of his constitutional rights, and informs him of the belief that he or she is carrying contraband drugs. The agent then requests permission to examine the suspect's suitcase or other bag. A further warning is sometimes given to the effect that, if the suspect refuses, the agent will proceed immediately to request a magistrate to issue a search warrant. Occasionally, a request to search occurs in a more public area. Occasions where the search involves body and clothing are not involved here. If the person consents, a search is made. If no consent is given, the person is formally placed under arrest and the bag is opened without consent.

Since initiation of the DEA airport detail, agents have searched 141 persons in 96 airport encounters prompted by their use of the courier profile and independent police work. Some encounters led to more than one search. Agents found controlled substances in 77 of the 96 encounters and arrested 122 persons for violations of the narcotics laws. Of the 77 searches in which illegal drugs were found, the agents identified 26 consent searches. Forty-three searches were non-consensual. Illegal contraband was seized in all cases in which consent was not given and a search was made. In 15 to 25 consent searches, agents did not uncover any contraband drugs.

Agents develop files on individuals who fit all or a part of the courier profile. In a majority of cases, the file is not developed until the person leaves Detroit for one of the cities indicated earlier. These are kept open as "general file investigations", and the agents in the other cities are given this information. There are at present almost 75 of these "general file investigations" open.

*Van Lewis*

On July 8, 1975, at about 10:50 a. m., Susan LeBlanc, a ticket agent for American Airlines at the Detroit Metropolitan Airport, informed Agent Markonni that a suspicious person by the name of J. Hall had just purchased a ticket on Flight 101 to Los Angeles, California. She had been trained by Agent Markonni of DEA in the courier profile and had been asked to observe suspicious behavior and to report this to Markonni. She described Hall as a black male, late twenties, just under 6', slim build, glasses, long sideburns, wearing a blue denim leisure suit. He had initially requested a one way ticket to Los Angeles but then stated that he wanted a round trip ticket because if everything went okay he would be coming back later that evening. Hall purchased a first class ticket with small denomination currency. He checked a small suitcase which appeared empty to LeBlanc except for one small item which slid around from one end of the suitcase to another. After buying the ticket, Hall left the counter and conversed with another man who then came to the counter and bought a ticket on the same flight.

Markonni checked Hall's reservation and found that it had been made earlier that week by telephone and that a telephone number had been provided as a contact. Markonni checked the phone number and found it to be listed to a Mr. William Lewis, 7248 Rutland, Apartment 305, Detroit. The agent then went to the apartment and identified himself to the apartment manager who spontaneously suggested that the agent must be there to inquire about William Lewis in apartment 305. The agent inquired as to why he thought so, and the manager said that the Detroit Police Department had the apartment under surveillance for alleged narcotic traffic. The description given by Lewis' apartment manager was nearly identical to the one provided by Ms. LeBlanc. The apartment manager informed the agent that he believed that Lewis lived somewhere other than in the apartment and provided the agent with a description of Lewis' car and the license plate number.

The license plate was registered to a Mr. William V. Lewis, 18463 Edinbor-

ough, Detroit. The driver's license number referred to on the registration also belonged to Mr. William Van Lewis at the Edinborough address. A check was made with the Detroit Police Department who informed Markonni that Van Lewis had been arrested in February, 1973, for possession of heroin, and that he had been previously convicted for attempted unlawful use of an automobile and for uttering and publishing. The description of William Van Lewis matched that of J. Hall.

Agents conducted this investigation intermittently on July 8 and concluded at approximately 10:00 p. m. Markonni left word with American Airlines to alert him when Hall was scheduled to return. At 4:00 a. m., on July 9, the agent was awakened by an American Airlines employee who informed him that Hall was returning on a flight from Los Angeles arriving at 6:43 a. m. that morning.

Two agents went to the airport where they saw a man fitting J. Hall's and William Van Lewis' description exit the aircraft and go to the baggage area. While waiting for his baggage, the man discarded an American Airlines ticket envelope in a trash can. This ticket envelope was retrieved. Van Lewis observed the two agents, feigned disinterest, but appeared nervous. Van Lewis' bag was not placed on the baggage belt until all other baggage had been retrieved, leaving only Van Lewis and the two agents present in the area.

When the man retrieved the bag, the agents believed that they had probable cause for arrest based upon the following factors: use of an alias to purchase the ticket; the use of small currency to pay for the ticket; the suspicious itinerary of traveling to Los Angeles, a center for drug importation, and back in one day; an almost-empty suitcase; Van Lewis' failure to change clothes; Van Lewis' rental of an apartment under surveillance for narcotic activity while he resided elsewhere; his prior record of having been arrested for possession of heroin; and his nervousness at being watched at the airport.

Having picked up his suitcase, which also matched a description given by Ms. LeBlanc, and departed the terminal, the man was approached by the two agents who identified themselves, informed him that they believed he was in possession of narcotics, and requested him to accompany them to a small office near the terminal exit. He then provided identification in the name of William Van Lewis. Van Lewis was given his *Miranda* warnings and, when asked if his suitcase was locked or unlocked, opened the suitcase without response, revealing only a shaving kit and one piece of clothing inside. The agents opened the shaving kit and found heroin. Van Lewis did not object to the search and offered no resistance.

### Hughes

DEA agents observed the defendant leaving an American Airlines non-stop flight from Los Angeles which arrived in Detroit about 4:00 p. m. on October 6, 1975. They thought she resembled a person who had been convicted for possession of four pounds of heroin a short time before. She was smartly dressed in what appeared to be an expensively tailored denim pants suit. She appeared nervous and walked fast as she proceeded down the concourse. She picked up no luggage and carried only a small shoulder bag as a purse. As she got into a cab, agents stopped her and asked for identification. Her driver's license showed the name of Paula Hughes. Her ticket bore the name D. Wilcox. She was in fact the sister of a person convicted of violating the narcotics laws about two months earlier. Agents asked her to return to the American Airlines baggage agent's room and told her that they suspected her of carrying contraband drugs. *Miranda* warnings were given to her and agents requested permission to examine her bag. She declined. She was placed under arrest and the bag was opened, searched, and heroin was found.

### McCaleb, White and Page

On October 28, 1975, DEA agents observed two men and one woman later

identified as McCaleb, White and Page depart an American Airlines non-stop plane arriving from Los Angeles. They had · no baggage or coats, but Page carried a shoulder bag. The agents recalled that they had seen one of the men and Page board the plane for Los Angeles the evening before wearing the same clothing. They did not carry baggage as they boarded the plane. Agents followed the trio as they went to the baggage claim area. Ms. Page either made a local telephone call or went to the restroom on the way to the baggage claim area. The group walked together through the concourse but did not converse as normal people do when they depart a plane. White and Page stood to one side in the baggage claim area as McCaleb claimed one bag. They followed McCaleb out of the baggage claim area and did not claim luggage. Page appeared nervous, looking around. McCaleb was nervous and perspiring, but White appeared to be very cool. As they walked to the parking lot, the three were approached by agents who identified themselves and requested identification. All of them produced driver's licenses indicating the names McCaleb, White and Page. Agents observed that McCaleb's bag was tagged with the name D. Robertson, 5565 Dickerson, Detroit. None of the driver's licenses had this name or address. The return flight tickets produced by the defendants bore the names Mr. and Mrs. Robertson and a Mr. Johnson. When interrogated, Ms. Page said that she was not married and that she had been in Los Angeles for one week.

The three persons were asked to return to a small office in the airport where they were advised of their constitutional rights. Each indicated that they understood their rights. When asked who owned the suitcase, McCaleb said "It's my suitcase." The agent told McCaleb that he would like permission to search the suitcase but that if he refused he would proceed immediately to the magistrate's office and attempt to obtain a search warrant. McCaleb hesitated, and then asked Page for the key. Page gave him the key and he unlocked the suitcase and stood back for the agent. The agent opened the suitcase and found heroin and three American Airlines flight coupons in the name of Mr. and Mrs. F. Washington and J. Smith for the evening flight to Los Angeles the day before. After the search the three persons were placed under arrest.

### Competing Fourth Amendment Interests

■ Once defendants have presented a *prima facie* case of illegal search, the government must assume the burden of proof that any search made was lawful. *United States v. Thompson*, 409 F.2d 113, 117 (6th Cir. 1969). The government has the burden of establishing by a preponderance of the evidence the existence of one or more exceptions to the Fourth Amendment's general warrant requirement. *See Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 626–627 (1972); *United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973). Likewise, where the government relies on a consent to search, it bears the burden of showing voluntariness. *United States v. Cupps*, 503 F.2d 277, 281 n. 11 (6th Cir. 1974).

The government justifies the searches in these cases on two theories: (1) agents had probable cause to arrest the defendants so that the searches were incident to valid arrests; and (2) defendants Van Lewis and McCaleb consented to the searches of their luggage.

These cases are not an off-shoot of the government's effort to protect the public from air piracy by restricting the personal liberty of individual travelers through the use of hijacker profiles, magnetometers, or the search of luggage and passengers, all of which would be abhorred in other circumstances but has been generally upheld on varying grounds if done responsibly and sensitively. As a general rule, these searches are not "unreasonable." *See, e. g., United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974); *United States v. Palazzo*, 488 F.2d 942 (5th Cir. 1975); *United States v. Cyzewski*, 484 F.2d 509 (5th Cir. 1973). The

searches in the cases before the court came after the flight, not before. They were not predicated on the need to insure the safety of a plane or its passengers. They have a very different but important purpose, to control and eliminate the traffic in illegal drugs.

The government has embarked on a new program of law enforcement in an effort to reduce illegal drug trafficking. Instead of relying on field agents to establish contact with dealers, to make buys, and to infiltrate the narcotics apparatus, the DEA has borrowed a page from the efforts to stop hijacking and is putting forth a major effort to prevent the transportation of drug contraband by cutting off the flow of drugs at its source. The problem, of course, is a large and important one for a major metropolitan area like southeastern Michigan where drug traffic is so great that the court is swamped with criminal cases, at least two-thirds of which seem to be drug-related.

The government asserts that its efforts to control and prevent illegal drug use is as massive and as important as has been the effort to prevent air piracy. It contends that measures no less demanding of the populous are needed to achieve this goal. Both law enforcement programs use a profile to help identify suspects.

■ Although the problems caused by illegal drug traffic in the metropolitan areas of the country are serious indeed, they are quite different from the problems posed by the threat of air piracy when both are viewed within the framework of the Fourth Amendment. The would-be air pirate, by obstructing the right to travel and endangering life in wholesale fashion, threatens the fabric of the republic and strikes at the very heart of our legal and moral relationships with one another. To protect public life and liberty, the law has sanctioned the development of special rules governing airport security searches as long as they are "reasonable" within the meaning of the Fourth Amendment. Reasonableness must be tested against the need to search. When the public danger, and hence the need, is as great as it is in the case of airport security, reasonableness within the meaning of the Fourth Amendment requires less factual justification. See A. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 390–92 (1974).

■ As damnable as drug traffic is, its regulation involves the protection of no special public interests like those at play in airport security. Regulation of drug traffic is achieved through enforcement of laws adopted by Congress which are similar to laws prohibiting bank robbery, bribery, or conspiracy. Thus, the court perceives no fundamental public interest at stake in routine enforcement of the drug laws which calls for the development of rules unique to airport drug searches. Accordingly, the government's rights in these cases must be tested against basic Fourth Amendment principles rather than by rules derived from an air piracy context.

■ May the government search without arrest or consent after a stop on a reasonable or founded suspicion? The answer is "yes" if the search is limited to a frisk for a weapon motivated by an officer's reasonable suspicion of danger. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The answer is "no" if the search is for drugs and goes beyond that essential search for protection. *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The search after an investigative stop should require a showing of probable cause, except for the protection of the officer. *Terry v. Ohio, supra.* However, the information gathered from a valid identification stop could be added to the information gathered previously to determine whether there was probable cause. In other words, the totality of the circumstances could lead the agent to believe that there was "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*

*v. Ohio, supra.* In the cases before the court, investigative stops were made. Even with the information developed as a result of the interrogations, as will be demonstrated, there was not at that time in the cases of Hughes and McCaleb, White and Page probable cause to search.

### Search Incident To Arrest

■ A person at the time of his lawful arrest may be subjected to a full search of his person, *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), or the area within his immediate control, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *United States v. Kaye,* 492 F.2d 744 (6th Cir. 1974), holds squarely that a *Chimel* search may extend to a suitcase. Thus, if the arrests of the defendants are valid, the searches are valid.

■ An arrest warrant is not required for a valid arrest. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S.L.W. 4112 (1976). But probable cause that a crime has been committed and that the person detained committed it must exist. The question is whether the agents in these cases had probable cause to arrest the defendants. In one case, they did; in two others, they did not.

The determination of probable cause in these cases is especially problematic because there is no direct evidence that crime had been committed nor that any of the defendants committed one prior to the searches. In short, the "smoking gun" is lacking. Circumstantial evidence, equally as probative as direct evidence before the law, implicates these defendants, if at all. The issue is whether the circumstantial evidence in these cases rises to the level of probable cause. To make this determination, the law requires that the agents be required to articulate the grounds for their beliefs and in these cases they have done so. DEA has demonstrated that as a result of its sensitivity to people and their characteristics, it succeeds in most cases in determining both that a crime has been committed and who committed it. That searches after arrest have always uncovered contraband is significant in determining "probability", one essential element of probable cause.

■ Although the court believes that the agents involved in these searches are extraordinarily accomplished, use of the profile presented in these cases is itself insufficient to establish probable cause. It may be appropriate to invade the privacy of all air travelers in order to protect the freedom of travel from the threat of air piracy, but the court should not approve a procedure that may involve widescale invasion of privacy, particularly if used by less skilled people or by those who may be less than completely honest, to enforce ordinary criminal statutes without some indicia of culpability other than the courier profile.

Unless agents have more indicia of criminal activity than that indicated by their observation of the profile factors made public in the record, probable cause will be lacking. Additional information about a given suspect is necessary. This need not be much; perhaps not as much as might be required to sustain an arrest or search where one of the ingredients of probable cause is an informant's tip, something, in other words, which singles out a suspect from the innocent traveling population.

In the Hughes and the White, McCaleb and Page cases, the only information suggestive of probable cause articulated by the agents was a limited number of characteristics which might easily be observed in many other innocent travelers. Short trips to major cities which also function as drug import centers, little or no luggage, nervous gestures or conversation upon arrival, or the uses of aliases do not of themselves give rise to probable cause that a suspect is a drug courier. Given an absence of probable cause to arrest these defendants, the searches of Hughes' handbag and McCaleb's suitcase were invalid as incident to arrest.

■ The action against William Van Lewis falls into a different category. Agent Markonni learned through first-hand investigation a series of probative facts which went beyond the courier profile. The unsolicited comments of Van Lewis' apartment manager about police surveillance of the premises and information about Van Lewis' prior record corroborated the suspicions raised because Van Lewis appeared to meet the profile. The combination of profile plus independent evidence rose to the level of probable cause for arrest on the facts of this case. Thus, search of Van Lewis' suitcase was valid as a search incident to that arrest.

*Consent to Search*

■ The final issue is whether defendants consented to the searches. There clearly was no consent in the case of Paula Hughes. However, the court finds that in both the Van Lewis and McCaleb, White and Page cases, the acts of the defendants amounted to a consent to search under *Schneckloth v. Busta-monte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and that in all three cases the limited detention for questioning and identification did not invalidate the consent under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974). *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Consent will not sustain a search where the consent is the product of an illegal detention. *See Wong Sun v. United States, supra*, at 484–86, 83 S.Ct. at 415–416, 9 L.Ed.2d at 453–454; *Manning v. Jarnigan*, 501 F.2d 408, 411–12 (6th Cir. 1974); *United States v. Hearn, supra*, at 243. So, the court must determine whether defendants' detention was a valid investigative stop or an arrest invalid for lack of probable cause.

In this connection, *Almeida-Sanchez v. United States, supra*, and *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), are instructive. Although these are sometimes referred to as border search cases, their holdings and dicta are not so limited. The Supreme Court emphasized that the searches in these cases could not be justified on the plenary power to conduct a border search, but that the agents must observe the same constitutional safeguards as if their authority did not come from the Immigration and Nationality Act.

In *Almeida-Sanchez, supra*, the court dealt with searches conducted by roving patrols far from the border and required the showing of probable cause before a search could be conducted. The stopping was held to be had without "founded suspicion" that the occupants were illegal aliens. In *Brignoni-Ponce, supra*, the court built on *Almeida-Sanchez* and upheld limited investigative stops on facts that do not amount to probable cause for arrest:

" . . . because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion . . . The officer may question the driver and passengers . . . and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." 422 U.S. at 881–82, 95 S.Ct. at 2580, 45 L.Ed.2d at 616.

■ The thrust of these cases is that agents have the power to stop for temporary investigation and interrogation persons about whom they have a "founded suspicion" of involvement in narcotics traffic. Anything more than temporary detention based upon reasonable suspicion, for example a search, requires probable cause. That defendants met the courier profile gave rise to a "founded suspicion" which permitted the limited interrogation and identification stops that took place in these cases.

The defendants in the cases before the court were subjected to varying kinds of restraint during the process of investigation. In determining the validity of the various restraints on the movement of the defendants, the court observes that the agents had a double problem. The airport stops were begun not just to find, identify, and arrest a person for a crime known to have been committed but also to determine whether a crime had been committed.

The use of information acquired by the agents from airline personnel and others and their observations of people amounts to good, permissible police work. Clearly, at some point, this type of information could be sufficient to permit the stopping of a traveler for identification based on "founded suspicion." *United States v. Almeida-Sanchez, supra; United States v. Brignoni-Ponce, supra.*

The limitation put on the movement of the defendants at the airport when the agents, in light of their experience and knowledge about the actions of persons involved in drug trafficking, stopped them for interrogation about their identity and itinerary is not an illegal arrest for lack of probable cause. A limited stop is not an arrest requiring the full showing of probable cause. *United States v. Richards,* 500 F.2d 1025 (9th Cir. 1974).

That persons detained temporarily are asked to move to a quieter place for further questions does not change the character of the detention from investigation into formal arrest. *United States v. Richards, supra.* There are many cogent reasons for not interrogating travelers in the hustle and bustle of the airport's public areas. These involve the safety of both parties, the ability to converse effectively, the embarrassment to the person detained, and others. So the question of defendants' consent under *Schneckloth v. Bustamonte, supra,* remains. The court believes that Lewis and McCaleb, the persons who claimed ownership of their suitcases, did consent to search.

*Schneckloth* involved a request to search the trunk of a car. Officers asked the driver of the car, "Does the trunk open?" The driver said "yes", got the keys, and opened the trunk. This action was consent. The court held that it was not necessary to show that the defendant knew he had a right to refuse consent, or that he was warned of his right to refuse but instead that the voluntariness of the consent must be determined from the totality of the circumstances. The factors stressed in *Schneckloth* to determine the voluntariness of the consent are the youth of the accused, his educational level, intelligence level, advice on constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment. That the defendant is in custody or under valid arrest does not necessarily vitiate consent under the standards set forth in *Schneckloth, supra. United States v. Watson, supra.*

In the cases before the court, all of the defendants are apparently adults of at least average education and intelligence. They were advised of their constitutional rights. They had not been in any formal detention, and there had been no repeated or prolonged questioning nor any physical punishment. All of the factors suggested indicate that the acts of the defendants were voluntary.

Defendant Van Lewis actually opened his bag exactly the way the driver opened the trunk in *Schneckloth.* In the McCaleb, White and Page case, McCaleb obtained the key to the bag from Page, unlocked the suitcase, and stepped back for the agent to open the case. No clearer evidence of intent to permit the opening and inspection could be given. The court holds that in these two cases consent was validly given.

For the reasons stated in this opinion, the motion to suppress in *United States v. Hughes* is granted, and the motions to suppress in *United States v. Van Lewis* and *United States v. McCaleb, White and Page* are denied.

So ordered.