**UNITED STATES of America, Plaintiff,**

v.

**John Anthony McCLAIN, Defendant.**

**Crim. No. 5–82014.**

United States District Court,
E. D. Michigan, S. D.

Dec. 30, 1977.

Frederick S. Van Tiem, Acting U. S. Atty., and Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Charles S. Brown, and S. Allen Early, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

KEITH, Circuit Judge, Sitting by Designation.

This matter was before this court on defendant's motion to suppress pursuant to Rule 12(b), Fed.Rules of Crim.Pro., evidence of drug trafficking obtained by the government after a search of defendant's luggage at Detroit Metropolitan Airport on November 25, 1975, by an agent of the Drug Enforcement Administration (DEA). Briefs were allowed in support of and in opposition to this motion and the matter came on for an evidentiary hearing on September 10, 1976 at which time testimony was heard in open court from DEA Special Agent Paul Markonni and Metropolitan Airport Police Officer Theodore Simon Garcia. At the conclusion of the hearing the court granted defendant's motion and ordered the evidence suppressed. Trans. at 83.

I

On November 25, 1975, Agent Markonni was on duty at Detroit Metropolitan Airport. At approximately 7:18 p. m. he observed the defendant, a young Negro male, deplane from American Airlines flight No. 98, arriving nonstop from Los Angeles. The defendant carried a small piece of luggage with him from the airplane. He proceeded to the American Airlines baggage claim area, and made a telephone call enroute to the baggage area. Agent Markonni had continued to watch McClain after he left the airplane because he appeared to the agent to be "unusually" nervous.

As McClain exited the airport terminal and was about to enter a taxicab, Agent Markonni stopped him, identified himself, and requested identification from him. McClain produced a California driver's license in the name of John McClain. His address on the license was listed as 764 Doheny # 1, Los Angeles, California. Agent Markonni testified that the name John T. McClain was familiar to him as being listed in DEA intelligence reports as a major narcotics distributor in California, and that the address at 764 Doheny # 1 was used by this John T. McClain to conduct narcotics transactions. He had also previously obtained information from DEA agents in Los Angeles that John T. McClain used his nephews and sons as drug couriers. Therefore, after receiving this information as to the defendant's identity, Agent Markonni requested that McClain accompany him to a private area out of public view in the terminal building—the first aid room—so they could continue this conversation. They were joined in the room by a Wayne County Sheriff's Deputy and by Metropolitan Airport Police Officer Theodore Simon Garcia.

Once in the first aid room, Agent Markonni told McClain that he suspected him of possessing a quantity of narcotics. He requested permission to search his luggage, and advised him of his right to refuse the search. McClain indicated that Agent Markonni could search his luggage. Agent Markonni first searched the large wardrobe suitcase, but found no drugs there. He then began to search the smaller suitcase which McClain had carried off of the plane. This suitcase had a number of zippered pockets on the outside, and a zipper with a combination lock covering the center section. Agent Markonni first searched the outside compartments and found only various toilet articles there. He then attempted to open the center section and found it locked by the combination lock. Agent Markonni asked McClain for the combination to the lock. McClain responded that he did not have the combination, that he had borrowed the suitcase from an uncle. Agent Markonni then left McClain in the first aid room with a Wayne County Sheriff's Deputy, and proceeded with Officer Garcia to take the small suitcase to the American Airlines security checkpoint, where he had the suitcase X-rayed. He noticed among the clothing four distinct, dark, rectangular shaped objects in the suitcase which, based upon his experience as a narcotics agent, he thought were narcotics containers. Agent Markonni and Officer Garcia then took the suitcase to the DEA office at the airport where they checked the DEA files to be sure that the address 764 Doheny # 1 was the address Agent Markonni thought it was. It was. They then returned to the first aid room, and again requested the combination to the suitcase lock from McClain. McClain again declined to give them the combination. Thereupon,

Agent Markonni broke the lock and opened the suitcase. Inside he found four containers of narcotics. The defendant was then placed under arrest for violation of the Controlled Substances Act.

## II

The initial question before the Court is whether the "investigative stop" of McClain as he was about to leave the airport was reasonable under the circumstances and in light of the facts then known to Agent Markonni. If not, then the stop violated McClain's Fourth Amendment right to be free of unreasonable searches and seizures, and the evidence obtained by the government as a result of the stop and subsequent search must be suppressed.

■ A police officer may conduct a limited frisk search for weapons without the consent and before the arrest of an accused, if the search is motivated by a reasonable suspicion that the suspect is armed or dangerous. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Agent Markonni testified that he had no suspicion that McClain was armed, and that he did not search him for his own protection or the protection of others.[1] Thus, the search involved in this case does not come within this *Terry* exception.

■ Although "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time," *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with

---

1. Agent Markonni testified as follows under cross-examination:

    Q. You weren't afraid of him were you?
    A. No.
    Q. You didn't think he was carrying a gun, did you?
    A. No, not on his person.
    Q. What do you mean, not on his person?
    A. He could have had a gun in his checked baggage.
    Q. Oh, I see.
    A. But not on his person.
    Q. You felt you were safe?
    A. Yes, I felt that I didn't—I didn't have any problem with him, no, so far as safety was concerned.
    Trans. at 31–32.

rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880 (1968). The stop must be based on more than an officer's unsupported intuition, *United States v. Mallides*, 473 F.2d 859, 862 (9th Cir. 1973), or his good faith. *See, Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).[2] The officer may obtain "specific and articulable facts" through his direct observation, or as a result of his prior investigation of the defendant, or from a tip from a reliable informant. Thus, in *Terry v. Ohio, supra*, the stop could be upheld on the following "specific and articulable facts" which the police officer observed:

> He had observed Terry, Chilton and Katz go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare at the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

*Ibid.*, 392 U.S. at 22–23, 88 S.Ct. at 1880. And in *Adams v. Williams, supra*, a stop was upheld where a police officer, driving alone on car patrol at 2:15 a. m. in a high crime area, was approached by a known

---

2. In *Beck v. Ohio, supra*, and *Henry v. United States, supra*, the Supreme Court overturned petitioners' convictions because their arrests had not been based on probable cause. Although a police officer does not need probable cause to arrest before he can investigate possible criminal activity, *Adams v. Williams, supra*, "the notions which underlie both the warrant procedure and the requirements of probable cause remain fully relevant in this context [of investigatory stops]." *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879. This "notion" is that the conduct of the police officer must be reasonable in light of the facts before him to justify his intrusion into the privacy of the accused, and the intrusion itself must be reasonably related in scope to the government interest which justified it in the first place. *Ibid.* at 21, 88 S.Ct. 1868.

> The Court in *Terry* indicated that the judicial inquiry into the question of "reasonableness" is a dual one. A reviewing court must objectively evaluate the 'specific and articulable facts which, taken together with rational inferences from those facts' and determine: (1) whether the facts warranted the intrusion on the individual's Fourth Amendment rights, and (2) whether the scope of the intrusion was reasonably related "to the circumstances which justified the interference in the first place." (Emphasis in original, footnote omitted.)
> *Carpenter v. Sigler*, 419 F.2d 169, 171 (8th Cir. 1969). This is so because, as the Supreme Court noted in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1974):
>> The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721, [89 S.Ct. 1394, 22 L.Ed.2d 676] (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *id.*, at 16, 88 S.Ct. [1868] at 1877, and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Id.* at 20–21, 88 S.Ct. [1868] at 1879; *Camara v. Municipal Court*, 387 U.S. 523, 536–537, [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967).
>> *Ibid.* at 878, 95 S.Ct. at 2579.

informant who told him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. 407 U.S. at 144–45, 92 S.Ct. at 1921.

█ The stop of McClain by DEA Agent Markonni involved the use of the drug courier profile which has been implemented by the DEA at Detroit Metropolitan Airport. Some of the characteristics of a drug courier have been described as follows:

(1) the use of small denomination currency for ticket purchases; (2) travel to and from major drug import centers, especially for short periods of time; (3) the absence of luggage or use of empty suitcases on trips which normally require extra clothing; and (4) travel under an alias.

*United States v. Van Lewis*, 409 F.Supp. 535, 538 (E.D.Mich.1976), *aff'd.* 556 F.2d 385 (6th Cir. 1977). The characteristics of the profile were described by Agent Markonni under direct examination at the evidentiary hearing as follows:

Q.: Were you instrumental in compiling what is known as a drug courier's profile, sir?

A.: Yes, I was.

Q.: Is that profile utilized by the offices of the Drug Enforcement Administration at the Airport?

A.: Yes, it is.

Q.: Could you please describe for purposes of the record to the court what that profile means and the criteria by which you utilize the profile in surveilling individuals?

A.: Basically, it's a number of characteristics which we attribute or which we believe can be used to pick out drug couriers. And these characteristics are basically things that normal travelers do not do, and, in other words, you may have one characteristic that will apply to someone, but not a number of them. These are things that even the ticket agents and airline personnel believe to be suspicious and they are, basically, obvious nervousness. An individual taking a trip to a far-away city with very little or no luggage, and, to us, specifically, the cities of Los Angeles and San Diego and some of the Texas border areas where narcotics are distributed—the most significant heroin distribution area in the United States right now.

Individuals who will fly under assumed names. Individuals who will give false or fictitious call back telephone numbers to the airlines. Individuals who travel with large amounts of currency, and this is noted by either the ticket agent—excuse me—either the ticket agent or the airport security people during routine searches of baggage.

Individuals who will deplane and make a telephone call directly after or immediately after deplaning. This, again, is not one of the most significant characteristics but yet it holds true in most of the cases that we have encountered.

Basically a courier is a person travelling alone, a person who generally will not have anyone meet him or her at the airport.

In the majority of cases the courier has been a black female.

Q.: Well, how were these characteristics compiled, Mr. Markonni?

A.: Essentially, when we started this detail at the airport, we didn't really know what we were looking for. The majority of our cases, when we first started, involved cases we made based on information from law enforcement agencies or from airline personnel. And as these cases were made, certain characteristics were noted among the defendants.

At a later time we began to see a pattern in these characteristics and began using them to pick out individuals we suspected as narcotic couriers without any prior information.

Trans. at 7–9. In the instant case, the only characteristics known to Agent Markonni when he stopped McClain were that McClain had arrived in Detroit on a flight from Los Angeles, he appeared to be travelling alone, he made a telephone call upon

**200**

deplaning, and he appeared nervous.[3] Each of these factors is consistent with innocent behavior. The court is of the opinion that these factors standing alone are innocent and do not give rise to a "founded suspicion" which would justify an investigative stop. See *United States v. Floyd*, 418 F.Supp. 724 (E.D.Mich.1976), *aff'd. in part and rev'd. in part, sub nom., United States v. Roseborough*, 571 F.2d 584 (6th Cir. 1977).

The United States Court of Appeals for the Sixth Circuit has had occasion recently to examine investigative stops and arrests of suspected drug couriers at Detroit Metropolitan Airport based on the drug courier profile. In *United States v. Van Lewis, supra*, the district court upheld three investigative stops involving five different defendants.[4] The district court's opinion as to the stop and subsequent arrest of defendant Van Lewis was upheld on appeal, *United States v. Lewis*, 556 F.2d 385 (6th Cir. 1977), on the ground that when the DEA agent (Markonni, the same agent as in the instant case) approached Van Lewis at Detroit Metropolitan Airport, he not only had enough information about Van Lewis to create a "founded suspicion" that this defendant was engaged in drug trafficking but he also had enough information to make an arrest based on probable cause.

What Agent Markonni knew for the purposes of probable cause was that appellant had taken a short trip, lasting less than one day, to Los Angeles, a distant city from which federally controlled narcotics had been illegally coming into Detroit; that appellant had used an alias when paying for his ticket, which indicated the likelihood of an illicit purpose in the trip, that appellant had taken with him to Los Angeles one suitcase that was virtually empty; that appellant had a

prior arrest for possession of heroin and had two non-drug related convictions; that appellant had left with American Airlines a telephone number to an apartment which was noticeably under surveillance for narcotics traffic; that appellant's personal residence was a place other than the apartment under surveillance for narcotics traffic, which supported the inference that the apartment under surveillance was a place used by appellant for narcotics traffic; and that appellant had returned to Detroit wearing the same clothes as when he had left.

556 F.2d at 389–390. See also, *United States v. Prince*, 548 F.2d 164 (6th Cir. 1977). It is obvious from the above that the information about Van Lewis which had been obtained by the DEA prior to his stop and detention at the airport was far greater than the information Agent Markonni had about McClain when he stopped him at the airport. However, the Court of Appeals in *Lewis, supra*, specifically declined to uphold Van Lewis' arrest on the basis of the drug courier profile. 556 F.2d at 389.

In the *Van Lewis* opinion *supra*, the district court also upheld the stop and subsequent arrest of the defendants McCaleb, White, and Page. These defendants had been observed by DEA agents deplaning from an American Airlines flight from Los Angeles without baggage, or coats, though Page (a woman) did carry a shoulder bag. The agents who had placed the deplaning passengers under surveillance recalled seeing Page and one of the men board a plan to Los Angeles the night before without any baggage and wearing then the same clothes they had on now. As the group left the plane, Page may have made a telephone call. They walked without conversing to the baggage claim area where McCaleb

---

**3.** Agent Markonni testified that it was McClain's nervousness more than anything else which caused him to be suspicious of him. Trans. at 6–7, 28–29. This is simply too amorphous and subjective a basis upon which to justify an investigative stop, *United States v. Rogers*, 436 F.Supp. 1 (E.D.Mich.1976) (Freeman, J.), although it might justify continued surveillance of the individual until the agent was either satisfied that his suspicions were

groundless, or had established a factual, as opposed to intuitive, basis for these suspicions.

**4.** It appears from the *Van Lewis* opinion that the court upheld the stop of the defendant Hughes, but granted her motion to suppress on the ground that she did not consent to have her bag searched, and the agents had no probable cause to arrest her. 409 F.Supp. at 540, 545.

claimed one bag. Page and McCaleb appeared nervous to the DEA agents but White did not. As the group walked to the parking lot they were approached by the agents who asked them for identification. There was a discrepancy between the names on the drivers' licenses which Page, White and McCaleb produced, and the names on their flight tickets and the name tag on the suitcase. They were asked to accompany the agents to a small office at the airport where they were told their constitutional rights, and where the suitcase was opened by Page. Heroin was found in the suitcase and the defendants were formally placed under arrest. 409 F.Supp. at 541.

On appeal, the Court of Appeals reversed the convictions of Page and McCaleb (White's motion for a directed verdict of acquittal had been granted at trial), finding that the activity observed by the DEA agents—three persons returning on a non-stop flight from Los Angeles after a short trip, and having only one suitcase between them—was consistent with innocent behavior. *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1977). The court also found that even if the stop were valid, the subsequent detention of the defendants went beyond the scope allowed by *Terry*, and constituted an unlawful arrest, 552 F.2d at 720–721, and the defendant's did not "freely and voluntarily" consent to the search of their bags. 552 F.2d at 721.

The decision of the Court of Appeals in *United States v. McCaleb, supra*, requires that the evidence obtained by the government from the search of McClain's baggage on November 25, 1975, be suppressed at trial since the stop and detention of McClain were illegal.

It cannot seriously be argued that McClain gave his consent to the search of the bag in which the heroin was found. He denied ownership of the bag, did not unlock the bag for the agents, did not consent to have the bag X-rayed, did not give the agent the lock combination with which to open the bag, and did not consent to have the bag broken into. Trans. at 15–17.

Agent Markonni testified that after he and a Wayne County Sheriff's Deputy escorted Mr. McClain to the first aid room in the airport's South Terminal, he advised McClain that he believed he might be in possession of a large quantity of drugs, informed him of his constitutional rights, and told him that he had a right to refuse a search of his belongings and his person. Trans. at 14. Thereupon McClain did consent to have the bags examined. Trans. at 15. However, looking at the totality of the circumstances surrounding this consent, pursuant to *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and in light of McClain's subsequent refusals to consent to or assist in the further search of the smaller bag, this court concludes that McClain's consent was not "freely and voluntarily" given. *United States v. McCaleb, supra*, 552 F.2d at 721. McClain had been restrained in his liberty by Agent Markonni, Metropolitan Airport Policeman Garcia, and the Wayne County Sheriff's Deputy who accompanied him to the first aid room and stayed with him during the examination of his luggage. McClain was formally detained in the first aid room when his consent was requested and while his bags were searched, yet the agent and police officers had at that time no probable cause to arrest him. The court concludes that the search and subsequent seizure of the evidence sought to be introduced in this case was made without the free and voluntary consent of the defendant, and cannot be otherwise justified as subsequent to a lawful arrest. *United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975).

ACCORDINGLY, defendant's motion to suppress was granted.

IT IS SO ORDERED.