IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANTHONY DAVIS, | § | |
| | § | |
| Defendant-Below | § | No. 175, 2023 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos. 2007007688, 2007007351 |
| | § | & 2101001980 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: February 21, 2024
Decided: April 23, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 23rd day of April, 2024, after careful consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1) The appellant, Anthony Davis, has appealed his convictions in the Delaware Superior Court for drug dealing, drug possession, and traffic offenses. For the following reasons, we affirm the Superior Court's judgment.

(2) Davis was arrested and charged with drug offenses on two separate occasions, July 16, 2020 and January 6, 2021; both arrests followed traffic stops, the lawfulness of which has not been challenged.

(3)    During the July 16, 2020 traffic stop, a New Castle County police officer ordered Davis to exit his vehicle after the officer observed a "tear-off baggie"[1]—an item the officer opined was consistent with drug possession—in plain view on the passenger-side floor of Davis's vehicle.  A search led to the discovery of 55 glassine blue bags of suspected heroin stamped with the words "final destination" in Davis's pants and one additional bag of suspected heroin in Davis's vehicle.  Officers also seized cash totaling $457 from Davis's vehicle and person, which included nineteen $20 bills, three $10 bills, six $5 bills, and seventeen $1 bills.  The next morning, during a check of the patrol car in which Davis had been transported to the police station the night prior, an officer discovered 45 additional glassine blue bags of suspected heroin stamped with the words "final destination" in an empty ammunition box in the back of the vehicle.

(4)    A forensic analysis of the substances seized from the July 16, 2020 arrest showed that the suspected heroin was actually 6.953 grams of cocaine, 6.6738 grams of methamphetamine, and 1.22 grams of fentanyl.

(5)    As a result of the July 16, 2020 arrest, Davis was indicted on three counts of drug dealing (cocaine, methamphetamine, and fentanyl), two counts of

---

[1] App. to Opening Br. at A52.

drug possession (cocaine and methamphetamine), and three counts of failure to use a turn signal.[2]

(6) During the January 6, 2021 traffic stop, New Castle County police officers discovered 97 bags of suspected fentanyl and 46 bags of suspected crack cocaine in a void under the gearshift on the driver's side of Davis's rental vehicle. A forensic analysis of the substances seized during the January 6, 2021 traffic stop showed 9.263 grams of cocaine and 3.94 grams of fentanyl. Officers also seized $490, which included "lots of $20 bills, one 10, and a bunch of ones[,]"[3] from Davis's person and nine $1 bills, a cellphone, and a screwdriver from the vehicle.

(7) As a result of the January 6, 2021 arrest, Davis was indicted on two counts of drug dealing (heroin and fentanyl), one count of drug possession (cocaine), and one count of resisting arrest.[4]

(8) Davis was tried by juries separately for the offenses related to each arrest. He was tried for the offenses related to the July 16, 2020 arrest on March 6–7, 2023 and for the offenses related to the January 6, 2021 arrest on March 14–15, 2023.

---

[2] Davis was originally indicted for drug dealing (heroin, cocaine, and methamphetamine) and was reindicted after the forensic analysis.

[3] App. to Opening Br. at A437.

[4] The State entered a *nolle prosequi* on the resisting arrest charge prior to trial.

(9)    Before trial, the State disclosed by letter to Davis's counsel that Detective Jeffrey Silvers might be called as an expert witness at both trials

> to testify that the behavior observed, presence or absence of paraphernalia, quantity of drugs, packaging of drugs, currency possessed, the local customs, practices and procedures of the drug trade, which can include the role deadly weapons can play in the drug trade, language contained in the text messages/cell phone examination, and/or any other circumstances present demonstrate an intent to deliver.[5]

(10)    Davis did not move to exclude Detective Silvers's testimony before trial.

(11)    At Davis's first trial, Detective Silvers testified that he had worked for the Wilmington Police Department for over 25 years and had participated in "thousands"[6] of drug investigations.  The detective noted that, in his interactions with individuals found to be in possession of controlled substances, he looks at "money . . . communications . . . [and] packaging,"[7] to determine to whether the individual is selling drugs as opposed to holding them for personal use.  Detective Silvers testified that cocaine and fentanyl are "typically packaged in very small plastic containers . . . small viles . . . [or] Ziplock bags,"[8] and that the 6.9653 grams of cocaine and 1.21 grams of fentanyl seized in Davis's case would be worth approximately $700 and $1,500 on the street, respectively.  He also testified that

---

[5] App. to Opening Br. at A512.
[6] *Id.* at A177.
[7] *Id.* at A179.
[8] *Id.* at A182.

"small blue glassine bag[s] stamped [were] common for packaging [h]eroin and/or fentanyl[,]" that stamps signify "a brand . . . to get people to want to purchase that stamp[,]" and that you can "get a better price if you buy a bundle" which is "typically . . . 13 bags."[9] Detective Silvers concluded that the items possessed by Davis were "more consistent with drug sales" based on "[t]he amount of drugs that were located[.]"[10]

(12)   At Davis's second trial, Detective Silvers testified that 9.23 grams of cocaine was worth "about $900,"[11] that the 3.94 grams of fentanyl was worth $10 per .007 grams, and that there was no personal use paraphernalia found in Davis's rental vehicle.   Detective Silvers further testified about the "presence of [a] screwdriver" in the rental vehicle.  He stated that "[i]n a rental car, it's not common to have tools . . . " but that "[i]t's not uncommon for people transporting drugs around . . . to find a hiding place in case they get pulled over by the police."[12]  Presumably, the detective intended to imply that a screwdriver could be used to gain access to a hidden compartment in the vehicle.[13]   Detective Silvers also opined that text messages from the seized cellphone were "consistent with drug talk . . . with

---

[9] *Id.* at A183–84.
[10] *Id.* at A188.
[11] *Id.* at A427.
[12] *Id.* at A431.
[13] An officer testified earlier that the discovery of the screwdriver in the vehicle had led to a more "in-depth" search of the vehicle during which they located controlled substances hidden in the empty compartment below the gearshift. *See id.* at A294–95, A299–301.

somebody saying that they have product, the buyer at that point is saying, I don't have any money right now but I'll get back with you when I do."[14] Detective Silvers concluded that "[t]he case [was] very consistent with drug dealing."[15]

(13) Davis did not object to Detective Silvers's testimony during either trial.

(14) The jury in the first trial found Davis guilty of one count of drug dealing (fentanyl) and three counts of failure to use a turn signal. In the second trial, Davis was convicted of two counts of drug dealing (cocaine and fentanyl) and one count of drug possession (cocaine). The court held a single sentencing hearing following completion of both trials, and Davis was sentenced in the aggregate to 24 years at Level V incarceration, suspended after one year, followed by probation.

(15) On appeal, Davis argues that "the trial court[s] committed plain error and violated Davis's due process rights by permitting inadmissible and highly prejudicial drug courier profiling testimony as substantive evidence of guilt, in direct contradiction of this Court's prohibition on the same."[16]

(16) We review a claim that evidence should have been deemed inadmissible by the trial court, when no contemporaneous objection was made at trial, for plain error.[17] Under the plain-error standard of review, this Court will take

---

[14] *Id.* at A432.
[15] *Id.* at A439.
[16] Opening Br. at 12.
[17] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

6

notice of, and grant relief for, "plain errors affecting substantial rights" of a defendant.[18] To constitute plain error, the error must adversely affect a substantial right and be so clearly prejudicial as to jeopardize the fairness and integrity of the trial process.[19] The burden of persuasion is on the defendant to prove that an error not raised at trial constitutes plain error.[20]

(17) Davis argues that the admission of Detective Silvers's testimony constituted plain error because the court failed in its role as a gatekeeper to "exclude from consideration such evidence [that the court] finds to be unreliable as a matter of law."[21] Specifically, Davis argues that the court failed to exclude "drug courier profiling" testimony.[22]

(18) A drug-courier profile is "[t]he set of characteristics found to be typical of a person transporting illegal drugs . . . derived from the collective or distilled observations of drug smugglers by many law-enforcement personnel."[23] Stated another way, "[a] drug courier profile is an unofficial list of general behavior patterns engaged in by typical drug traffickers."[24] The essence of typical "drug-courier profile" testimony is that an investigating officer, because of his expertise, can

---

[18] *Id.*
[19] *Id.*
[20] *Johnson v. State*, 813 A.2d 161, 165 (Del. 2001).
[21] Opening Br. at 20 (citing *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 498 (Del. 2000)).
[22] *Id.*
[23] *Drug-Courier Profile*, Black's Law Dictionary (11th ed. 2019).
[24] Jay M. Zitter, Annotation, *Admissibility of Drug Courier Profile Testimony in Criminal Prosecution*, 69 A.L.R. 5th 425 (1999).

discern on the basis of otherwise lawful activity that a suspect is acting as a drug courier. In what one scholar identified as "[t]he first drug courier profile case,"[25] the following characteristics used to identify drug couriers were listed: "(1) the use of small denominations of currency for ticket purchases; (2) travel to and from major drug import centers, especially for short periods of time; (3) the absence of luggage or use of empty suitcases on trips that normally require extra clothing; and (4) travel under an alias."[26]

(19) In *Johnson v. State*, this Court held that "drug courier profile evidence may not be admitted during a criminal trial as substantive evidence of guilt."[27] In *Johnson*, the police were called to an "assault in progress" at an apartment complex in Dover.[28] Officers entered the apartment and found Johnson, who had been shot in the thigh and bound at the legs with duct tape, on the floor with a small child next to him.[29] While Johnson received treatment at a local hospital, a nurse discovered what was later determined to be 136 grams of cocaine in the child's diaper.[30] When

---

[25] Mark J. Kadish, *The Drug Courier Profile: In Planes, Trains and Automobiles; and Now in the Jury Box*, 46 Am. U.L. Rev. 747, 748 n.1 (1997) (citing *United States v. Van Lewis*, 409 F. Supp. 535, 538 (E.D. Mich. 1976)).

[26] *Id.*

[27] *Johnson*, 813 A.2d at 166. Drug-courier-profile evidence is typically "considered as a component of probable cause for a search or seizure by law enforcement officers." *Id.* at 165 (internal citations omitted); *see also United States v. Lui*, 941 F.2d 844, 847 (1991) ("These [drug courier] profiles are commonly used by agents as a basis for reasonable suspicion to stop and question a suspect or to form probable cause.").

[28] *Johnson*, 813 A.2d at 163.

[29] *Id.*

[30] *Id.*

questioned, Johnson told officers that he was traveling in a rental vehicle from New Jersey to visit a friend in Maryland and that his assailant—an acquaintance who requested that Johnson go to the Dover apartment—"must have planted [the cocaine] to set him up."[31]  Johnson was ultimately charged with drug trafficking and possession with intent to deliver cocaine.[32]  At trial, to prove that the drugs in the child's diaper belonged to Johnson, the State offered the testimony of a detective "as an expert witness regarding the sale of illegal drugs" who testified

> that Johnson fit the profile of a drug courier because:  Mount Vernon, New York, where the car was rented, is only 10-15 miles north of the Bronx; that New York City is a major "source city" for cocaine sold in Dover; and that illegal drug dealers often have couriers transport the contraband in rental cars.[33]

In its closing argument, the State "theorized that the drugs must have belonged to Johnson, in part, because he [was] from New York City . . . and because he had a rental car, a 'red flag' indicator for a drug courier."[34]

(20)  But testimony like that in *Johnson*—the case Davis principally relies upon—that an individual not known or found to be in possession of illegal drugs fits a drug-courier profile, is distinguishable from expert testimony correlating the quantity of drugs possessed by a defendant and the presence of related items (packaging, currency, scales, personal use paraphernalia, etc.) with the "intent to

---

[31] *Id.* at 163–64.
[32] *Id.* at 162.
[33] *Id.* at 164.
[34] *Id.*

deliver" element of a drug-dealing charge.  And the latter is permissible in a criminal trial.  This court has held that, when prosecuting a drug dealing charge, the State must

> prove an additional element beyond possession, quantity [or] packaging to establish that the defendant was not possessing the drugs for personal consumption.  This element can take the form of expert testimony . . . linking the amount and packaging of drugs [the defendant] possessed with any intent to deliver those drugs.[35]

(21)   Here neither the State nor Detective Silvers asserted that Davis fit a drug-courier profile.   Rather, Detective Silvers's testimony related to the type, quantity, and packaging of the cocaine, methamphetamine, and fentanyl found on Davis's person and vehicles; amount and denominations of currency in Davis's possession; practices and procedures of the drug trade such as stamping and bundling; language contained in text messages; and other circumstances Detective Silvers opined demonstrated an intent to deliver.  Such testimony cannot be fairly characterized as "drug-courier profile" testimony, and it was not plain error for the Superior Court to admit it.[36]

---

[35] *See Hudson v. State*, 956 A.2d 1233, 1240 (Del. 2008) (quoting *Cline v. State*, 720 A.2d 891, 892–93 (Del. 1998)).

[36] Davis argues that even if Detective Silvers's testimony was not "drug courier profiling," it was nonetheless profiling testimony and should be inadmissible because it is unreliable.  Davis bases this argument on facts and contentions not presented to the trial court.  We decline to usurp the gatekeeping function of the trial court in ruling on the admission of such testimony on an underdeveloped record when there was no objection to the testimony prior to, or at, trial. Defendants who wish to challenge the reliability of expert testimony or the qualifications of a purported expert to opine on issues such as were in play here should do so in the trial court, by way of motions in limine, objections at trial, and vigorous cross-examination.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice